1  ANTHONY J. NAPOLITANO (SBN: 227691)
       anapolitano@buchalter.com
2  BUCHALTER, A Professional Corporation
   1000 Wilshire Boulevard, Suite 1500
3  Los Angeles, CA 90017-1730
   Telephone: (213) 891-0700
4  Facsimile: (213) 896-0400

5  DENISE H. FIELD (SBN: 111532)
       dfield@buchalter.com
6  BUCHALTER, A Professional Corporation
   425 Market Street, Suite 2900
7  San Francisco, CA 94105-2491
   Telephone: (415) 227-0900
8  Facsimile: (415) 227-0770

9  Attorneys for secured creditor
   SUB-ZERO GROUP, INC.

10

11                 **UNITED STATES BANKRUPTCY COURT**

12                 **SOUTHERN DISTRICT OF CALIFORNIA**

13  In re                          | Case No. 24-01376-CL7

14  PIRCH, INC.,                    | Chapter 7

15                    Debtor.       | RS No. BPC-001

16                                  | **DECLARATION OF ANTHONY J.**
                                    | **NAPOLITANO IN SUPPORT OF SUB-**
17                                  | **ZERO GROUP, INC.'S OMNIBUS**
                                    | **REPLY TO OPPOSITIONS TO**
18                                  | **MOTION FOR RELIEF FROM THE**
                                    | **AUTOMATIC STAY**
19
                                    | [Reply and Request for Judicial Notice
20                                  | concurrently filed]

21                                  | **Hearing:**
                                    | Date:     June 28, 2024
22                                  | Time:     10:30 a.m. PDT
                                    | Place:    U.S. Bankruptcy Court
23                                  |           Department 1
                                    |           325 West F Street
24                                  |           San Diego, California 92101
                                    | Judge:    Hon. Christopher B. Latham
25

26

27

28

BUCHALTER
A PROFESSIONAL CORPORATION
LOS ANGELES

BN 82774256v2

## DECLARATION OF ANTHONY J. NAPOLITANO

I, Anthony J. Napolitano, declare as follows:

1. I am an attorney at law duly licensed by the State of California and admitted to practice before all courts of the State of California and the United States District Court for the Central District of California. I am a Senior Counsel of the law firm Buchalter, P.C. ("Buchalter"), bankruptcy counsel of Sub-Zero Group, Inc., a Wisconsin corporation, as successor by merger to Sub-Zero Group West, Inc., a California corporation, doing business as Sub-Zero Group West ("Sub-Zero"), secured creditor of debtor Pirch, Inc. (the "Debtor").

2. The facts set forth herein are true of my own personal knowledge, except where stated on information and belief, and as to those facts, I believe them to be true. If called as a witness, I could and would testify to the facts stated herein. I am over 18 years of age.

3. I submit this Declaration in support of Sub-Zero's omnibus reply to (1)the *Trustee's Opposition to Sub-Zero Group West, Inc.'s Motion for Relief from Automatic Stay* [Docket No. 176] filed by Leslie T. Gladstone, as chapter 7 trustee of the Debtor's bankruptcy estate and (2) the *Limited Objection of Lombardi Construcntion, Inc. and Chris Sznewajs to the Motions of Sub-Zero Group West, Inc. for Relief from the Automatic Stay and to Allow Credit Bidding* [Docket No. 203] filed jointly by Lombardi Construction, Inc. and Chris Sznewajs both in opposition to Sub-Zero's *Motion for Relief from the Automatic Stay* [Docket No. 89] (the "Motion").

4. On April 22, 2024, the Court provided notice to all interested parties that the 341(a) meeting of creditors in the Debtor's bankruptcy case would take place on May 28, 2024 at 8:30 a.m. PDT via Zoom. I attended that meeting of creditors and participated in the questioning of the Debtor's principal, Mekall Kaltenbach. Thereafter, I directed my assistant to obtain an audio recording of the meeting of creditors from the Office of the U.S. Trustee.

5. On Friday, May 31, 2024 at 4:40 p.m. PDT, my assistant and I received an email from Todd Tappe of the Office of the U.S. Trustee transmitting a link to a "Box" share site that had an .mp3 file containing the audio recording of the Debtor's 341(a) meeting of creditors. My assistant then provided the .mp3 file to Buchalter's word processing department to transcribe the

1

BUCHALTER
A PROFESSIONAL CORPORATION
LOS ANGELES

BN 82774256v2

hearing audio. After the hearing audio was transcribed, I had different technicians review the hearing audio and the transcript and make any corrections given that some of the recording was faint. I then directed my associate to review the entirety of the hearing audio and transcript for accuracy and to make any further corrections to the transcript that were needed. I then reviewed the redline of the transcript, the transcript itself, and listened to the salient portions of the hearing audio and corresponding transcript that were quoted in our briefing to verify its accuracy and make any final revisions. A true and complete copy of the transcript is attached hereto as **Exhibit 1**.

6. Thereafter, on May 29, 2024, the Court provided ECF notice to all interested parties receiving ECF notifications that the 341(a) meeting of creditors in the Debtor's bankruptcy case had been continued to June 5, 2024, 2024 at 2:30 p.m. PDT via Zoom. Again, I attended that meeting of creditors and participated in the questioning of the Debtor's principal, Mekall Kaltenbach. Thereafter, I directed my assistant to obtain an audio recording of the meeting of creditors from the Office of the U.S. Trustee.

7. On June 6, 2024, my assistant obtained the audio file from Todd Tappe of the Office of the U.S. Trustee for the June 5, 2024 continued 341(a) meeting of creditors. My assistant then provided the .mp3 file to Buchalter's word processing department to transcribe the hearing audio. Given that the continued 341(a) meeting was over 4.5 hours long, I only had Buchalter's word processing department transcribe the section of the audio related to my questioning of the Debtor's principal, Mekall Kaltenbach.

8. After the hearing audio was transcribed, I had a different technician review the hearing audio and the transcript and make any corrections. I then directed my associate to review the hearing audio and transcript for accuracy and to make any further corrections to the transcript that were needed. I then reviewed the redline of the transcript, the transcript itself, and listened to the salient portions of the hearing audio and corresponding transcript that were quoted in our briefing to verify its accuracy and make any final revisions. A true and complete copy of the transcript is attached hereto as **Exhibit 2**.

**DECLARATION OF ANTHONY J. NAPOLITANO IN SUPPORT OF SUB-ZERO GROUP, INC.'S OMNIBUS REPLY TO OPPOSITIONS TO MOTION FOR RELIEF FROM STAY**

9.      On or about April 11, 2024, Buchalter had obtained a certified UCC lien search for Pirch, Inc. with a through date of April 1, 2024.  I received the certified search report from Telos Legal Corporation, which include the UCC filings for Sub-Zero and CP Fixtures Holdings, LLC. I pulled the UCC-1 Financing Statement for CP Fixtures Holdings, LLC from that report.  Attached hereto as **Exhibit 3** is a true and complete copy of the UCC-1 Financing Statement for CP Fixtures Holdings, LLC.

I declare under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on June 14, 2024 at Los Angeles, California.

*/s/ Anthony J. Napolitano*
ANTHONY J. NAPOLITANO

BUCHALTER
A PROFESSIONAL CORPORATION
LOS ANGELES

**DECLARATION OF ANTHONY J. NAPOLITANO IN SUPPORT OF SUB-ZERO GROUP, INC.'S OMNIBUS REPLY TO OPPOSITIONS TO MOTION FOR RELIEF FROM STAY**

BN 82774256v2

EXHIBIT 1

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

ANTHONY J. NAPOLITANO (SBN: 227691)
    anapolitano@buchalter.com
BUCHALTER, A Professional Corporation
1000 Wilshire Boulevard, Suite 1500
Los Angeles, CA  90017-1730
Telephone: (213) 891-0700
Facsimile:  (213) 896-0400

DENISE H. FIELD (SBN:  111532)
    dfield@buchalter.com
BUCHALTER, A Professional Corporation
425 Market Street, Suite 2900
San Francisco, CA  94105-2491
Telephone: (415) 227-0900
Facsimile:  (415) 227-0770

Attorneys for secured creditor
SUB-ZERO GROUP, INC.

## UNITED STATES BANKRUPTCY COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re | Case No. 24-01376-CL7 |
| PIRCH, INC., | Chapter 7 |
|         Debtor. | **341(a) MEETING TRANSCRIPT** |

**Hearing:**
Date:      May 28, 2024
Time:     8:30 a.m. PDT
Place:    via Zoom.us
Judge:   Hon. Christopher B. Latham

1

**TRANSCRIPTION OF 341(a) MEETING**

1

TRANSCRIPT OF 341(a) MEETING OF CREDITORS
Case No. 24-01376-CL7
May 28, 2024 at 8:30 a.m.

2

3    Debtor's Representative:                    Mekall Kaltenbach

4    Counsel for the Debtor:                     K. Todd Curry, Esq.

5    Chapter 7 Trustee:                          Leslie T. Gladstone, Esq.

6    Counsel for the Chapter 7 Trustee           Christin Batt, Esq.

     Counsel for Secured Creditor                Anthony J. Napolitano, Esq.
7    Sub-Zero Group, Inc.:

8    Counsel for the United States Trustee       Haeji Hong, Esq.

9    Various Other Parties Appeared as
     Stated on the Record

10

11        LESLIE T. GLADSTONE, CHAPTER 7 TRUSTEE:  Okay.  I'm going to go ahead and

12    get started.  My name is Leslie Gladstone.  I am the interim Trustee for each of the cases on the

13    calendar today.  I will become the permanent Trustee after today's meeting unless there is an

14    election called during any of the meetings on the calendar today.  Just a couple of housekeeping

15    items before we get started since there are so many people on this line.  There is no recording

16    permitted of these proceedings so if you are recording I need you to turn it off.  There is an official

17    recording that is maintained by the United States Trustee's Office and you can obtain a copy of that

18    recording if you desire by contacting the United States Trustee's Office.  You would just need to

19    identify the case name, the number and the date and time of the hearing in order to obtain a transcript

20    of today's examination.  Please also, I have been muting a few of you as you've been coming on if

21    there has been background noise.  There's a lot of people on this line so I do need you to be on

22    mute.  I'm going to mute a couple more of you here.  If you can stay on mute until you're given an

23    opportunity to ask questions if you have those you will be given an opportunity to do that later.

24        For the rest of my calendar today, other than Pirch, as you can see, the attorneys that are on

25    the line, there are a number of people here on one of my matters today.  Mr. Borough, I do see you.

26    Do you have your clients with you?  And you are on mute sir.

27        SPEAKER:  Sorry about that.  _____

28

2
**TRANSCRIPTION OF 341(a) MEETING**

BN 82841295v3

1  TRUSTEE: Alright, thank you.  Okay.  Mr. Calwell, I saw you I believe.  Okay.

2  CALWELL: [Inaudible]

3  TRUSTEE: Alright, and you're, are your clients with you sir?  Your clients.

4  CALWELL: He's not with me; he should be in the room, though. [Inaudible]

5  TRUSTEE: I haven't seen him come yet either but, so I mean I think we're going to take

6 some time and we're going to do an initial meeting of the Pirch matter first so that I can get most

7 of these people off the line.  But you may want to just make sure that he's on here or get him on

8 here.

9  CALWELL: Okay, will do.

10  TRUSTEE: And, Mr. Aarons.  Are you on the line?

11  AARONS: Yes, yes, Madaam Trustee I'm here.

12  TRUSTEE: Okay.  There you are.  Okay, thank you.  And is your client with you?

13  AARONS: She is not with me, but she is …

14  TRUSTEE: She is what? Sorry?

15  AARONS: _____ I see you _____

16  TRUSTEE: Okay.  And is just under Cathleen or is it under Cathleen Johnson?

17  AARONS: It's just under Cathleen Johnson.

18  TRUSTEE: Alright, I do see her as well. Thank you. Alright, do I have Antonio Laguna

19 here?

20  LAGUNA: Yes, I'm here.

21  TRUSTEE: Okay.  Thank you.  And Mr. Ramos, I see that you are on.  Are all of your

22 clients with you?

23  RAMOS: Yes, that is correct.  Did you receive our interpreter request.

24  TRUSTEE: Yes, I did.  Thank you.  And Ms. Raymond, are your clients with you?

25  RAYMOND: They are up in the Zoom room.

26  TRUSTEE: Okay, I see, thank you.  Alright.  And are there any creditors, okay, I know

27 there is a lot of creditors appearing on the Pirch matter.  Are there any creditors appearing on any

28 other matter today?  Apparently not.  Okay.  So, here is what we are going to do.  I'm going to go

**TRANSCRIPTION OF 341(a) MEETING**

1   ahead and start with the Pirch matter with an initial examination.  And my intention for, as you all

2   can see there is multiple people on the line here.  I think we're over 200 at this point.  So thank you

3   all for coming.  There are also multiple cases.  This is just a regular calendar that the Court schedules

4   and puts multiple cases on the same calendar.  That's not going to really work for us in the Pirch

5   case cause I know a lot of you have questions.  So the, but my, so my intention today is to explain

6   some things about the effect of a bankruptcy and to provide a status report to all of you.  I understand

7   that several of you may have questions for me and others may have questions for the debtor's

8   principals which, who are on the, well actually I didn't check that.  Yes, but Mr. Curry I saw you

9   are your clients on the line?

10        K. TODD CURRY:   Yes.   Good morning Ms. Gladstone.   I noticed that Mekall

11   Kaltenbach is on the line.  We were originally expecting Mr. Smith who had a death in the

12   immediate family, so I don't know what his status is.  Ms. Kaltenbach is the one who assisted me

13   with the schedules and signed all the schedules.

14        TRUSTEE:   Okay.  Yes.  Alright, thank you.  Appreciate that.

15        CURRY:   Like I said, she is online.  She's not here with me.

16        TRUSTEE:   Okay.  Thank you.  And then she identified by her name where I can find it

17   because I don't see her right now.  But, yeah.

18        CURRY:   Yes.  I think I saw it on the second page, at least on my display.  But her

19   name is ….

20        TRUSTEE:   Oh, I do see, okay.  I do see her now, yes.  Thank you.  Alright.  Okay.  So

21   as I said several of you are going to have and I expect that most of you probably have questions for

22   me rather than for Ms. Kaltenbach, but you will have an opportunity to ask those questions either

23   of me or of the debtor's principals.  I'm hopeful that my status report will answer many of your

24   questions but if it does not there is going to be three different opportunities for you to get your

25   questions answered.  One of those is that I am going to hold a Town Hall on May 31st at 9:00

26   o'clock.  The information to log into that Town Hall is going to be on the website and I'm going to

27   give you all the url for the website.  We can also provide the information in a direct link if you

28   contact the phone number that I'm also going to give you.  So I will further -- I'm going to give a

1   further update at that Town Hall, I'm also going to answer questions of customers, employees,

2   vendors on that date.  I expect that most of you are going to get the information that you need from

3   that source of information.  There is also going to be a continued meeting of this examination on

4   June 5th at 2:30 for any creditors or creditors attorneys that have questions of the debtor's principals.

5   Same Zoom as today is on June 5th at 2:30 and Pirch will be the only matter on that calendar.  And

6   then for any emergency questions for which answers are absolutely needed today, please send me

7   a chat this morning letting me know that you have an emergency question or two and that you, how

8   long you anticipate that your questions will take.  As you can see I do have a full calendar on this

9   morning so I'd really appreciate if you would limit to the, just the emergency questions.  As I said,

10  you'll have the opportunity to ask other questions on the other two dates.  So, first of all I'm just

11  going to give a status report and then I will put Ms. Kaltenbach under oath to answer a few questions

12  that I have and then also to open it up for any of those emergency questions.  As I indicated before,

13  we have a website for this case only and the website is https://pages.trustesolutions.com (but trustee

14  is only with one "e" the T-R-U-S-T-E) and then https://pages.trustesolutions.com/TrusteeGladstone

15  (with a capital "T" and a capital "G").  That again I will provide if you didn't get that or I can repeat

16  it again but there is also that phone number to call, a dedicated line for Pirch only which is (858)

17  247-0750.  If you have other questions or that will go to my assistant and she's returning calls daily

18  on just uhm … -- I'm going to put also in the chat to everybody the link to the website as well.  So

19  let me put that up. As far as -- I was just reading the chats here so just give me a second.

20       And I wasn't intending to record the Town Hall.  Somebody asked if I was going to record

21  the Town Hall.  I probably could do that but it won't be an official recording like these meetings

22  are because it's just something I'm doing myself just to provide everybody with as much

23  information as I can.

24       Mr. Napolitano, I have here your chat.  And here I will give you some opportunity today to

25  ask questions.  And as far as the dates and Zoom links and website for subsequent creditors

26  meetings, it would be the same for the meeting that's going to be continued for the principal

27  examination that would be the same login and password as you did today.  And the Town Hall will

28  be a different one.  Because I'm not permitted to use this one for that purpose but I will get back to

**TRANSCRIPTION OF 341(a) MEETING**

BN 82841295v3

1    you on -- that will be on the website and I can also put it in the chat today as well.  And yes, I will

2    put the website in the chat as well.  If I missed saying that, the Town Hall will be May 31st at

3    9:00 a.m.

4         Okay.  There is a lot of chats on here so I'm going to go ahead and I think I've gotten most

5    of them but then maybe there are a few others.  I'm going to just go ahead and give a status of

6    what's going on in the case and hopefully that will answer some of your questions.  So we talked

7    about the website and as soon as I get a moment here I'm going to go ahead and add that onto the

8    chat.  And if you don't get it on the chat you can also call (858) 247-0750 to get a link for the

9    website which will have all of the dates that I'm going to talk about today.  There's also going to

10   be a claim form sent out to you by the Court shortly.  The Court initially sends out a notice to

11   everybody just saying that claims, because a lot of bankruptcy cases don't end up having a

12   distribution and so they just send that out automatically.  I'm going to be requesting the Court to

13   send out a different notice that will tell you that you can file a claim.  If you have a claim, it will

14   give you instructions on how to do that.  That information is also on the website so if you want to

15   go ahead and get your claim filed now you can do so.  There's nothing that restricts you from doing

16   that.  So that claim form is viable in order for you to recover from the bankruptcy case.  So make

17   sure that you get -- it's very reasonable, they send you a one-page form.  You just attach to that

18   form whatever supporting documentation you have and you send it back to the Court.  So, it's a

19   simple process and blank claims forms will be sent out to you shortly by the Court.  But there is a

20   link on the website to obtain that claim form so you can send it out now if you want to.

21       For those of you that are customers and were buying products as a household use, there is

22   potentially a priority status that you would get for repayment of your claim so make sure to look

23   into that to see if you qualify.  I can't give you legal advice but I can tell you that that statute exists.

24       SPEAKER:    I have a question, which chat is it that you're speaking about because I don't

25   see anything in the chat?

26       TRUSTEE:    It's just the Zoom chat for the meeting?

27       SPEAKER:    Yes

28       SPEAKER:    The Zoom chat is only private to you, it's not a publicly viewable chat.

**TRANSCRIPTION OF 341(a) MEETING**

BN 82841295v3

Exhibit 1, Page 11

TRUSTEE:    Yeah, I haven't sent out any messages yet because I've been talking and I can't write and talk at the same time, but I'm going to send out the links. There have been several messages to me, but I don't think there's been any public to everybody.

SPEAKER:    Okay, thank you for that.

TRUSTEE:    Check.  No problem.  So as far as things that have happened in the case, we have filed a motion.  You are all getting a copy of it and you may have already received it.  I'm not sure if the court sends out that notice and it does get take a little bit since there's such a large mailing list in this case.  But there has been a motion to sell personal property filed by my office.  And that is to sell the remaining inventory in the distribution center.  So, when I came on board, I am appointed by Court to be the Trustee for the case.  And the -- when I came on board, Pirch had 17 different locations.  We have combed those down to seven locations so as to get out from under enormous rent obligations.  So there are seven remaining locations, four of which are distribution centers holding various items of inventory and the others are three showrooms that I'll talk about in a minute.

So for the four distribution centers we've sent out, we sent out a motion to sell the property that's in there.  The four distribution centers are accruing rent at approximately $250,000 a month, and between those four distribution centers, so it is absolutely vital that we get the -- get those assets sold so that it doesn't just all go to the landlord, basically.  So we have proposed to do that, that is a motion that's filed with the Court and needs to have Court approval.  It has gone out to all creditors of the case.  So you will have an opportunity to read it.  You have an opportunity to oppose it or to agree with it, whatever it is that you want to do.  And there will be a time period for doing that, that opposition.  I'll put some more information on this on the website as well, but in a nutshell, basically, we have a number of people that are claiming a number of customers that are claiming ownership of individual items of inventory.  We also have a number of lienholders that are claiming entitlement to the inventory as having a lien on it as superior rights in that regard.  And we have the landlords of course claiming expenses for what, for where the inventory is sitting.  And we have American Express and World Pay claiming entitlement to stand in the shoes of customers because of chargebacks that have occurred.  And if I am approximately, as I understand it, over $90 million

**TRANSCRIPTION OF 341(a) MEETING**

BN 82841295v3

1  of deposits were made by customers and there is far far less than that in inventory. So my feeling

2  and my business judgement on this and looking at it and looking at it in depthly was to get the

3  inventory sold to get it to get a pot of money that doesn't where I don't have to pay rent. And then

4  that way everybody can sort, we can sort out what your -- what any individual customers rights are

5  versus the credit -- the lien creditors' rights are versus the landlord expenses and cut off the landlord

6  expenses and come to a resolution with the court approval.

7       So again, you will get a copy of that motion coming to you. You have an opportunity to

8  object to it if you'd like to. There will be a hearing on June 24th at 11:00 on that -- on that motion.

9       There is also going to be a motion, we haven't filed it yet, as to the other three locations,

10  those are showrooms and that is being sold to a buyer, proposed buyer that I have negotiated a sale

11  with and we're going to be filing that this week. It will also be -- go to a court hearing and requires

12  court approval. We'll also have an opportunity for an overbid if there are buyers that wish to pay

13  more than what is being proposed by the buyer to pay. And again, that goes out to all the creditors.

14  So you will get a copy of that motion. You'll have an opportunity to object to it or to agree with it

15  if you choose. And that hearing, I believe is, is being held one week later on July 1st. I don't recall

16  the time of day of that hearing but I will put it on the website. It's probably either 10 or 11 o'clock

17  in the morning, but I'll, I'll check that and put that on the website.

18       GARCIA:      Hey how are?

19       TRUSTEE:     I'm going mute that Ms. Garcia, because we're hearing your other call. All

20  right. So really a really good way to stay up to date as is by being on, checking on that website also

21  to or to call the phone number if you've got additional questions that are not being answered there.

22  So I think that is all that I have as far as the status goes.

23       SPEAKER:     Good morning quick question sorry to interrupt everyone. If I had something

24  that was paid off and is sitting at a warehouse, I was just like my property is not ready to receive it

25  and is there any way to obtain it? To get it and be done with this type of thing. Or does it have to

26  go like everyone gets either their appliances for everyone just go to sell them and then we, we get

27  it up on _____?

28

**TRANSCRIPTION OF 341(a) MEETING**

BN 82841295v3

Exhibit 1, Page 13

1      TRUSTEE:   Ok.  It's a, it's a good question. It is, it is dealt with in detail in the motion

2  which you will get a copy of.  But, but essentially they -- as I understand the facts and again, I'm

3  brought in by the court upon the bankruptcy filing, so I wasn't there previously, but I understand

4  that there were over $90 million of deposits.   I believe all of them were 100% deposits on, on

5  various items of inventory by various customers.  Unfortunately, those were not tied to individual

6  items of inventory.  And the, as I understand it, the inventory had not done a complete valuation

7  yet, there hasn't been time.  But as I understand that the inventory that's on hand is more like $15

8  million, "one-five."  So there is not an opportunity to have everybody pick up their equipment

9  because it just was not tied to a particular item of equipment as far as I've seen.

10      Ok, and what I'm going to do as I would rather than have everybody -- cause there's almost

11  200 people on this line, so it's very difficult to do it that way, but I'm going to put them, so again,

12  a lot of these questions are questions for me and that's why I want to do the town hall where it's

13  only us.  So if there's things that you need to know today, then I'm happy to try to answer them.  I

14  think, take a look at the motion, read it, read what's on the website and, and them I'm, you know,

15  I'm happy to, I want to get all of your questions answered.  I just can't do it on my regular calendar

16  where the court give me basically less than 10 minutes for a case.  So because I'm just going to be

17  holding up everybody else the whole day if I do.  So if there's something that you need and is an

18  emergency status today, if not, than please come to the town hall on the 31st.  It's just that's on

19  Friday.  And I will just, it will just be us and I'll just answer any questions that you guys have.

20  Again, I'm happy to answer them today if they're urgent.

21      I believe Mr. Curry, I think what I'm going to do is now is to have Miss Kaltenbach put

22  under oath and them we can, we can handle any questions that people have on an emergency basis

23  for her.  And again, if there are questions of me, or if I haven't explained things right, I will try to

24  do again, again today one more time for those that are coming in late.  And if not, then definitely

25  come on Friday and I will explain it in detail for as, as, as long as you guys would like

26      MR. JONATHAN ESPY:   Can I ask an emergency question? Is there is there a fraud

27  aspect to this case?  I'm told that if there is anyone who paid by card is likely to get reimbursement

28  from the credit card companies.

**TRANSCRIPTION OF 341(a) MEETING**

BN 82841295v3

1    TRUSTEE:    So, yeah, that you.  Thank you.  And Mr. Espy, I the answer, the answer is

2    at this point, I don't know.  I don't have enough information.  I will be looking at that and that's

3    part of my responsibility is to identify fraud and I really don't know if it exists here or not at this

4    point in time.

5    TRUSTEE:    All right.

6    MARSHALL KRUPP:        I have a related question.

7    TRUSTEE:    Ok, and your name, sir, for the record?

8    KRUPP:        Marshall Krupp.

9    TRUSTEE:    Thank you.

10    KRUPP:        So as the trustee, do you have a responsibility to investigate and pursue

11    criminal charges on behalf of the creditors if there is legitimacy to such allegations?

12    TRUSTEE:    No exactly, but I have, part of my responsibility as a trustee is to identify,

13    you know, do a criminal referral if I think that's appropriate.  And that would be made to the United

14    States Trustee's Office, which is the administrative branch of the court that oversees trustees and

15    then, and then on to the, you know, federal prosecutors, if that's appropriate.  But I do not have the

16    power to commence criminal proceedings myself, but it is part of my job to refer to refer those

17    types of matters.

18    FRED MAYFIELD:   I have a question, can you hear me?

19    TRUSTEE:    I can and your name, Sir?

20    MAYFIELD:  My name is Fred Mayfield and I'm a vendor and I got to say my heart goes

21    out to all those customers.  This is a terrible thing.  However, we provided my company out in

22    Denver, Colorado, provided a lot of displays Pirch and as was their custom, the demanded these

23    displays be free.  We wanted to do this, so we provided many of these displays.  How can we get

24    those  -- we've heard it all as far as these activities go, can I get those displays back?  They're mine.

25    They were never given title to Pirch.  How is that being handled?

26    TRUSTEE:    Well, I'm, I'm not sure on that yet either, but I think you should contact my

27    office about that.  I think there's a , there's quite a few of you in that boat as well.  Certainly not as

28

**TRANSCRIPTION OF 341(a) MEETING**

1    many as customers, but and we're looking into the law behind those.  I don't have an answer, a

2    clear answer for you at this point.  But but happy to talk about that further.

3         MAYFIELD:    And one more quick question of the Merchandise that was in the showroom,

4    has that all been accounted for?  Because I had hear a lot of rumors that perhaps that are was a plant

5    to sell a lot of that merchandise before bankruptcy.  Do you know anything about that at all?

6         TRUSTEE:    I do.  I don't have any proof of it at this point, but I do understand that there

7    were some sales made just before the bankruptcy was was filed.  And I'm, and I, you know, that

8    will be part of the accountings that have to be provided to me.

9         SPEAKER:    I have a question.

10         TRUSTEE:    What is your name, sir?

11         SPEAKER:    Mike Hink just in regards to website that the chat, I tried to look it up, it says

12    the page does not exist [INAUDIBLE]

13         TRUSTEE:    Ok, I will do that, sir.  And I just haven't had time to put in on the chat yet,

14    but I will do that and I will also announce it again.

15         JEFF RUBIN: I have a question.

16         TRUSTEE:    Ok and your name sir?

17         RUBIN:    [INAUDIBLE]

18         TRUSTEE:    Ok, I'm barely hearing you but I'm doing my best.

19         RUBIN:    [INAUDIBLE]

20         TRUSTEE:    Not a lot, but just to know to talk loud if you can.

21         RUBIN:    Jeff Rubin

22         TRUSTEE:    I think you question was have I been in contact with the District Attorney, is

23    that right?

24         RUBIN:    [INAUDIBLE]

25         TRUSTEE:    Not at this time.  I do not have any evidence to be able to contact them.  As

26    I said just a couple of minutes ago, part of my job is to refer criminal matters if I find them in my

27    investigations and I would refer that to the US Trustee' Office and they would then refer it on to

28    the criminal prosecutors if appropriate.  But I do not have any of that type of evidence at this point

**TRANSCRIPTION OF 341(a) MEETING**

BN 82841295v3

1  in time.  I've only been on this case for I believe it's exactly a month now.  So we've had a number

2  of things to deal with and I do not have any of that type evidence at this time, it may be there, I'm

3  not sure.

4      RUBIN:        Second part of my question is …[INAUDIBLE]

5      TRUSTEE:    I'm sorry, I really can just barley hear you, sir.

6      RUBIN:        I said _____ [INAUDIBLE]

7      TRUSTEE:    No, that's not really quite exactly what I said, sir.  I said it, it appears that it

8  could be a Ponzi-like but I don't have the evidence yet, but that was based on the fact that there

9  was, you know, substantial deposits coming in with no – with not sufficient property to fill them.

10  But I'm, I'm happy, I am continuing my investigation and that is as I've said, that is part of what

11  my responsibility is.

12      KRUPP:       I have, I have another question related to that.  As the trustee, are you going

13  to retain a third party forensic investigator to look at the financials of the company for the last let's

14  see three to five years?

15      TRUSTEE:  Short answer, yes.  And again, all of these questions, I think it would be much

16  better if we can do this on Friday since I will be at your disposal then and happy to answer all of

17  these questions as to what I'm going to do and where this case is going.  But I'd like to get the

18  examination of the principal underway because I know there are some creditors that are wanting to

19  ask questions of the principal as well. So Mr. Curry, if you could make an appearance please and

20  we'll go ahead and do that next.

21      ED ROTH:    Could I ask one question? If the item was received, customized and received

22  in the distribution center?  Can you retrieve paid in full merchandise at the distribution centers.

23      TRUSTEE:    So again, I think you must have come in late.  I have already answered that

24  question.  We can talk about those again on Friday.  Okay?

25      ROTH:         [INAUDIBLE]

26      TRUSTEE:    All right, Mr. Curry?

27      CURRY:        Yeah, Good morning, Ms. Gladstone. This is Todd Curry.  I represent Pirch,

28  Inc. and attending the day on behalf of the company is Mekall Kaltenbach, who is the financial

1    officer, she the person that signed all of the paper, schedule, statements of financial affairs, that we

2    have filed in the court.

3        TRUSTEE:    All right.  Thank you.  Miss Kaltenbach, can you identify yourself so that

4    you come on the screen.

5        MEKALL KALTENBACH:  Yeah.

6        TRUSTEE:    Okay, great, and if you stay on on camera please.  And please raise your right

7    hand.  Do you swear the testimony you are about to give in this examination will be the truth, the

8    whole truth and nothing but the truth?

9        KALTENBACH:    I do.

10       TRUSTEE:    I'm gonna mute that person.  And please make sure that your phones are

11   muted, it's really distracting to have the background information, background talking.  Alright,

12   state your name please Ms. Kaltenbach.

13       KALTENBACH:    Mikall Kaltenbach

14       TRUSTEE:    And as I understand it you were the CFO for Pirch Inc. is that correct?

15       KALTENBACH:    Correct

16       TRUSTEE:    Are you also the person that reviewed and signed the bankruptcy schedules

17   and statement of affairs before they were filed?

18       KALTENBACH:    [inaudible]

19       TRUSTEE:    I cannot seem to mute this person.  Ms. Karen?  Ok, thank you.  She muted.

20   Alright. And the status of the schedules and statement of affairs.  Are we, do we believe them to be

21   complete at this point in time?

22       KALTENBACH:    We are making some revisions.  They are complete at the time we

23   filed them, but we will be adding some creditors.

24       TRUSTEE:    OK, is there anything other than additional creditors that you're adding?

25       CURRY:    Yeah, let me just chime in on that, Ms. Kaltenbach.  I've identified two areas

26   that we need to make some changes.  We need to add some creditors to Schedules E and F and

27   anticipate we will be doing that within about the next 10 days.  I think we have around maybe 100

28   or so of additional creditors so we're trying to figure out how, most efficiently, to do that.  We also

13

**TRANSCRIPTION OF 341(a) MEETING**

1  talked about transfers within in the two years - We have identified some sales of display units that

2  happened before the bankruptcy.  It was a substantial amount, I think it was hundreds of thousands

3  of dollars involved I believe.  I think that we need to amend to include some details on that in #13

4  and I think there may have been some actions after that.  So I think for that reason, we're going to

5  need to amend #13 of the Statement of Financial Affairs.  Ms. Kaltenbach, if you have anything

6  else, feel free to add that.

7        KALTENBACH:        Not at this point in time.

8        TRUSTEE:        Okay.   And then what is the status on the, I know we have several, had

9  several requests from my office to yours for documentation and thank you for providing a lot of

10  that.  I think there are still some things outstanding.  Where are we on that?

11        CURRY:        I'm not sure which one you're referring to.  I have to go back and look at the

12  email.  So I'll do that after we've completed today and let's see where we are and if you need any

13  more information, you know before town hall on Friday feel free to ask.  They didn't do everything

14  we can't get you what you need, I know there's a lot.

15        TRUSTEE:        Okay, yes.  And it does look like we may have found, we may have found a

16  bunch of keys.  I'm not sure what they're all for, but I'm trying to still identify the where the

17  vehicles are and which keys go to which.  We were able to move that one that was that was going

18  to be paved around, I think.  But where are the vehicles, Ms. Kaltenbach?

19        KALTENBACH:  I'm not sure at this moment.

20        TRUSTEE:        Okay.  Who would know that?

21        KALTENBACH:        I could follow up with internal people, but I'm not sure.

22        TRUSTEE:        Okay.  So do you know anybody in the in the in Pirch that would have known

23  where the vehicles are?

24        KALTENBACH:        Again, I would have to ask through the chain of command.

25        TRUSTEE:        Okay, who would that be?

26        KALTENBACH:        I would probably start with the logistics director.

27        TRUSTEE:        And who is that person?

28

**TRANSCRIPTION OF 341(a) MEETING**

BN 82841295v3

Exhibit 1, Page 19

1    KALTENBACH:        I would start with probably Jeremy Presents (?).  I should admit, I do

2    believe the golf cart might be located by the Cedros Jero walk.  But the other older vehicle, the

3    trucks , I'm not confident where those are located.

4    TRUSTEE:    Okay.  All right.  There was a representation made to me that, as I, well first

5    of all, let me say, as I understand it, all of the lease trucks were returned to the lessor.  Is that right?

6    KALTENBACH:        I'm not positive.  I, they did a mass pickup of the leased Penske

7    trucks.  I am not positive that they retrieved all of them.

8    TRUSTEE:    Okay.  And there was a representation made to me that some of those were

9    picked up with inventory in them.  Do you know anything about that?

10    KALTENBACH:        It is my understanding that there wasn't inventory in them, but that

11    was just what I was provided with.

12    TRUSTEE:    And who would have been providing you with that understanding?

13    KALTENBACH:        I would have to ask, I can't recall exactly who has given me that

14    information.

15    TRUSTEE:    Okay.  But you can you can locate the source of that information or who

16    would know?

17    KALTENBACH:        I will follow up on that, yes.

18    ROWE:        Leslie, my name is Scott Rowe.  I'm one of the people that purchased a

19    substantial amount of resources from Pirch.  I would, I would just love to understand, you know,

20    from my perspective. As you have the CFO on here.  How did they accept … I put a final deposit

21    two weeks before they closed their door for delivery, but I'm talking $90,000 and I'd like to know

22    how the CFO could not know that there were problems and took final deposits two weeks before

23    they shut their doors.  I think everyone this phone call would see a problem.

24    TRUSTEE: Go ahead. I'll permit that question. Ms. Kaltenback, can you answer it, please?

25    KALTENBACH:        Thank you Tom or Scott. So we were in discussions with that would

26    continue the business forward um up until the point that the showrooms closed. We did not -- we

27    had viable path forward as a company that were ongoing discussions.

28

**TRANSCRIPTION OF 341(a) MEETING**

BN 82841295v3

CURRY:        Yeah and to add to that, the there was an effort here to explore proceeding with a Chapter 11 instead of the Chapter 7 and you know Chapter 11 the business would continue forward. So I don't think that to go chapter 7 was made until maybe about a week to 10 days maybe maybe it was even shorter. I'd have to go back and look at my notes. But it was very short before the filing, before I was told, OK, you're doing a Chapter 7. So it was literally kind of last minute.

CREEK:        I have a question.

TRUSTEE:        I'm sorry, who is speaking?

CREEK:        Yes, elaborate on, on the other person actually.

TRUSTEE:        I need your name first, Sir. Sir, what is your name?

CREEK:        My name is Bill, last name is Creek.

TRUSTEE:        OK, go ahead, Sir.

CREEK:        To elaborate on what you said, two weeks before and workings (?) that are accurate. I found out, you know, in the last month and a half, so few, the few things that happened. And one of them. The, the salesperson actually told me the RQ I had for eight items that I, I was waiting for and one of them was a large purchase. It was a refrigerator and the refrigerator is supposed to be arriving. It took over a year and four months and it's supposed to be arriving way before that. And then the salesperson actually said, well it's going to be in March whether he was involved or he knew what is going to happen or not that I'm not really sure. I could not get a hold of him.

TRUSTEE:        Mr. Mr. Mr. Patrice, I understand all of that. And there's a lot of people in that boat that if you have a question you want to ask, you can ask it.

MR. PATRICE:        Yes.

TRUSTEE:        OK.

MR. PATRICE:        Yes, what I found out is that these refrigerators they are available everywhere else. So, so the problem is they were they elaborate what the other gentleman said about he actually gave a deposit of $90,000. They actually stole the money because they knew that they are filing bankruptcy.

**TRANSCRIPTION OF 341(a) MEETING**

BN 82841295v3

TRUSTEE:    OK, so again, this is not a question, Mr. Patrice.  I'm happy to talk about this at the town hall, but if you have a question for Miss Kaltenbach, then ask it. Otherwise I need to continue with her examination.

MR. PATRICE:        But, that's why I'm asking him or her.

ANOTHER SPEAKER:        Ms. Gladstone, I have a couple of questions directed to the CFO that I think is relevant to this discussion we're having right now.

TRUSTEE:    Go ahead sir.

MR CURRY:    Going to just, I'm going to just jump in and say two things. First of all, I know this is something we didn't have a chance to say this in the beginning, but these creditor meetings, they're not really supposed to be for individual creditors and their individual claims. It's supposed to be just generally to describe the neighbor location with assets and liabilities. That's number one. Number two, the decision on bankruptcy I just said a minute ago was not made until very shortly before we filed the case. So well, they knew they were going to file bankruptcy.

SPEAKER 3: Sorry. Todd

[INAUDIBLE – MULTIPLE VOICES TALKING]

CURRY: Do not interrupt me.

MR CURRY: You got your chance to talk and now I'm responding.  Say you knew the company knew was going to file the bankruptcy, I'm the one that filed the bankruptcy and the decision was made very shortly before.  There were efforts upon buyers, there were people filing actions (?) in multiple courts, bounty was being preserved right up until the bankruptcy to preserve …

TRUSTEE: Mr. Curry. Mr. Curry. Mr. Curry. Mr. Curry, you're not testifying today. Your client is and I would like to hear from her. So I think that that needs to stop, please. And and for the rest of you, there's a lot of people on this line. So if we start talking over each other, there's not going to be a record of anything. So please try to keep some some level of decorum here so that we can get through these questions. Usually what I do here is I ask a few questions. I'm required to ask certain, certain questions of Miss Kaltenbach. I may have some additional questions I'm going to ask and then I will open it up to those creditors that need their questions asked today. Remember

BN 82841295v3

1   I said at the beginning of this meeting, this meeting is going to be continued. So if you don't need

2   your, if it's not an emergency question, because I do have some creditors that have emergency

3   questions. So if, if we have an emergency, then we'll ask it today. If not, this meeting will be

4   continued to June 5th. Every time I gave you, I wasn't intending that because I've said I've

5   continued two things. So the the one is for me for questions of me is going to be the town hall for

6   questions of Miss Miss Kaltenbach is going to be the continued meeting on June 5th.

7        SPEAKER:    I have an emergency question.  Is a representative from Pirch going to be at

8   the town hall?

9        TRUSTEE: I wasn't intending that, because I've said I've continued two things.  One is for

10  questions of me is going to be the town hall.  For questions of Miss Kaltenbach is going to be the

11  continued meeting on June 5th. Of course, she's certainly welcome to attend. But I, I thought

12  thought I would try to divide it that way. So because I thought most of you, you know, more more

13  of you have questions for me than would have questions for her is what I is what I assumed. And

14  if I'm wrong on that you _____ there is a continued meeting on June 5th at 2:30 and we can go. We

15  can go, you know, as long as you're the only this will be the only matter on calendar that day. All

16  right, let me go back to Miss, Miss Kaltenbach.

17       ANOTHER SPEAKER: I have a question

18       TRUSTEE: Ok.  Again, I'm going to ask a few questions that I'm required to ask and then

19  I will open, Miss.. Just a minute, please. I'm speaking . . . I will open it up after I have finished the

20  questions that I'm required to ask. And then for anybody who has an emergency question that needs

21  to be answered today.  Otherwise it will be continued for another opportunity, opportunity to ask

22  questions.  So let me just get through my questions and then we will, I will open it up to any

23  emergency questions.  Already have some on chat that followed the instructions that I requested to,

24  to ask for the emergency questions by chat.  If you could do that, please, so that we can keep this

25  going.  All right. Miss Kaltenbach, did you review the petition schedules and statement of financial

26  affairs prior to them being filed with the court?

27       KALTENBACH:  Yes

28       TRUSTEE:  Did you sign the petition?

**TRANSCRIPTION OF 341(a) MEETING**

1    KALTENBACH:  Yes

2    TRUSTEE: And do you understand each of these documents and the information contained

3    in them?

4    KALTENBACH:  Yes

5    TRUSTEE: Have all of the assets of Pirch, Inc been listed in the bankruptcy schedules?

6    KALTENBACH:  Yes, to the best of my knowledge

7    TRUSTEE:  And other than the creditors that your attorney identified a few minutes ago,

8    the approximately 100 creditors that are being added by amendment have all of the creditors been

9    listed?

10    KALTENBACH:  To the best of my knowledge, yes.

11    TRUSTEE:  Are the and again, other than that amendment that's being filed, are your

12    bankruptcies, the bankruptcy schedules and statement of financial affairs for Pirch, Inc., true and

13    correct in all respects?

14    KALTENBACH: Yes, and the addition of the other mentioned amendments.

15    TRUSTEE: OK. And what is the status of the tax returns for the? When is the last tax return

16    filed?

17    KALTENBACH: For 2022.

18    TRUSTEE: And then what is being done as far as 2023?

19    KALTENBACH: We we haven't filed it yet.

20    TRUSTEE: Is there any work being done on it?

21    KALTENBACH: The trial balances were complete, but the tax forms not been completed.

22    TRUSTEE: And who is it that did that work?

23    KALTENBACH: CohnResnick I think.

24    TRUSTEE: I'm sorry what?

25    KALTENBACH: CohnResnick and Partners and I can provide the partners names after this

26    call as possible?

27    TRUSTEE: OK. That would be great. All right. And what about payroll returns?

28    KALTENBACH: The W2s?.

19

**TRANSCRIPTION OF 341(a) MEETING**

1    TRUSTEE: No. What about …Was the last payment final payroll return filed?

2    KALTENBACH:  I would have to ask HR. The 2023 tax forms were filed.

3    TRUSTEE: And when you're saying 2023 tax forms, what do you mean?

4    KALTENBACH:  When I received my W-2. I'm not sure I'll say that what one you're
5    referring to.

6    TRUSTEE: But nothing for 2024 W2s and nothing for first quarter of 2024

7    KALTENBACH:  I'm not positive I would have to ask HR.

8    TRUSTEE: And there wouldn't be anything past first quarter 2024 then was there any
9    payroll after March 31$^{st?}$

10    KALTENBACH: There's payroll in April.

11    TRUSTEE: OK. So right up to the when was the last payroll period?

12    KALTENBACH: April 17 it was, it was an obstacle. So last full period was April 12th and
13    then remaining employee termination.

14    TRUSTEE: So all, all pay, all wages were paid much, but you're not sure if the payroll
15    reports were done?

16    KALTENBACH:  I'm not sure what was filed. That's correct.

17    TRUSTEE: Okay. And were the taxes for that last payroll pay period paid the payroll taxes?

18    KALTENBACH:  The portion on direct deposit I believe was paid and I don't, I do believe
19    there is a portion open for manual checks that is a part of the amendment that we're going to file.

20    TRUSTEE: And manual checks to to what entity?

21    KALTENBACH:  To employees that um basically filing checks.

22    TRUSTEE:  Okay.

23    KALTENBACH: … the week of filing.

24    TRUSTEE:  I see. Got it. OK. Right,

25    ANOTHER SPEAKER:  I have a question.

26    TRUSTEE:  Just a moment, please, sir. I'm going to open it up to questions as soon as I can
27    get my questions answered, as I've said. All right. I think what I'm going to do at this point,
28    obviously we have a lot of documentation still pending between the between us. So I'm going to

20

**TRANSCRIPTION OF 341(a) MEETING**

1    take a minute here and go through the chats for people that did that as I requested. All right. So Mr.

2    Napolitano, I believe you were first as far as needing some emergency questions asked. You have

3    the floor, Sir.

4        ANTHONY J. NAPOLITANO: Thank you, Miss Gladstone, and thank you, Miss

5    Kaltenbach for appearing and testifying today. A couple of foundational questions. How long have

6    you been the CFO of Pirch?

7        KALTENBACH:  About six years, approximately. I became CFO June 2018.

8        NAPOLITANO:  And how long have you been employed with Pirch?

9        KALTENBACH:  Since March of 2016.

10        NAPOLITANO: And what was your role prior to becoming CFO?

11        KALTENBACH: I started as the Director of Financial Reporting, then I became the

12    Director of (inaudible), and then I was promoted to VP of Finance and then CFO.

13        NAPOLITANO: In your role as CFO, do you have responsibility and oversight over all

14    aspects of revenue management, expense management, inventory management?

15        KALTENBACH: Um. I have all financial accounting. I had an inventory control team, but

16    logistics rolled up under the COO for logistics.

17        NAPOLITANO: Under the COO?

18        KALTENBACH: Yes.

19        NAPOLITANO: And who's that?

20        KALTENBACH: Will Dillard.

21        NAPOLITANO: And who is responsible for your inventory management team?

22        KALTENBACH: So we had an inventory management team that reported to the controller,

23    and the controller reported to me.

24        NAPOLITANO: And who was the controller?

25        KALTENBACH: Sydney Chacon.

26        NAPOLITANO: How do you spell Chacon.

27        KALTENBACH: C-H-A-C-O-N.

28

**TRANSCRIPTION OF 341(a) MEETING**

BN 82841295v3

1   NAPOLITANO: Thank you. On Schedule A/B, which lists the property of the debtor as of

2   the petition date, for the inventory, you indicated inventory counts, the last date of that being

3   January 28th, 2024.

4   KALTENBACH: Yes. Oh, I actually can I modify one thing. Our controller did depart prior

5   to the bankruptcy. I should put that on record.

6   NAPOLITANO: When did the controller depart?

7   KALTENBACH:  I believe in March, I'd have to look for the specific date.

8   NAPOLITANO: One question on employment aspects. Are you still employed by the

9   debtor?

10   KALTENBACH: Yeah. I'm not earning a wage.

11   NAPOLITANO: When was last when was your last day of employment for the Debtor?

12   KALTENBACH: The last day I earned the wage was April 14th.

13   NAPOLITANO: Do you still have control over the debtor's books and records?

14   KALTENBACH: I have access, but I would not call it control.

15   NAPOLITANO: What accounting system does debtor use?

16   KALTENBACH:  Great Plains.

17   NAPOLITANO: Do you still have access to Great Plains?

18   KALTENBACH:  Yes.

19   NAPOLITANO: Let's turn now to my question on an inventory count and valuation.  The

20   schedules list, January 28th, 2024 as the last date of the inventory count. Who performed that

21   inventory count?

22   SPEAKER:  [INTERRUPTION....INAUDIBLE]

23   NAPOLITANO: Hold on a second. So we can have a clear record here, OK.

24   KALTENBACH:  So ultimately, the warehouses were responsible for their own counts, but

25   it was headed up by Richard Harris, our inventory control Manager.

26   NAPOLITANO: Did Richard Harris conduct the inventory count on January 28th, 2024 or

27   report to you on the inventory count?

28   KALTENBACH:  He conducted it, kind of oversaw it, so to speak.

**TRANSCRIPTION OF 341(a) MEETING**

1    NAPOLITANO: Was it a physical count of all units or was it a sampling?

2    KALTENBACH:  It was a physical count of all at the warehouse locations.

3    NAPOLITANO: Was Cohn Resnik? Let me ask a question first. Is Cohn Resnik the auditor

4    for the Debtor?

5    KALTENBACH:  Correct.

6    NAPOLITANO: Was Cohn Resnik part of that inventory count?

7    KALTENBACH:  They did an observation of that, correct?

8    NAPOLITANO: The valuation of $28.6 million as reflected on Schedule A/B for the

9    inventory, how was that arrived at?

10    KALTENBACH: I believe you're referring to a book number. The valuation is separate.

11    NAPOLITANO: There is two numbers correct? There's the -- I believe that is the book

12    number. Is that a book value? There's $28.6 million, how does the Debtor arrive at that?  Is that the

13    purchase cost of all inventory?

14    KALTENBACH: That would be the extended cost of the inventory

15    NAPOLITANO: As of time of ordering?

16    KALTENBACH:  That no, that's as of the filing so that would be as of the filing date

17    essentially.

18    NAPOLITANO: Is that on a FIFO or a LIFO basis?

19    KALTENBACH:  It . . . it's mixture between specific identification and average cost.

20    NAPOLITANO: And then the next valuation was $31.8 million, approximately. How did

21    the debtor arrive at that?

22    KALTENBACH: Cost plus normal margin for a brand.

23    NAPOLITANO: Does that assume that the inventory will be sold in the ordinary course of

24    business?

25    KALTENBACH: That assumes our value _____..

26    NAPOLITANO: As CFO in in the appliance industry, would you characterize a liquidation

27    sale or a bulk sale of inventory being within the ordinary course of business?

28    CURRY:  You know, I'll just now object for the record, that's really kind of a legal question.

**TRANSCRIPTION OF 341(a) MEETING**

1      NAPOLITANO: I think it's purely an accounting question, particularly for someone that

2  has over eight years' experience in the consumer appliance industry. If you were to sell inventory

3  through a liquidation auction or wholesale, do you believe that you'd be able to attain the same

4  value that you would through an ordinary, going concern sale transaction?

5      CURRY: I'll just object – calls for speculation - you can answer it Ms. Kaltenbach, but I

6  think that's a speculative question.

7      KALTENBACH:  I listed value of the inventory based upon my knowledge of the value

8  and disclosed how that value was derived.

9      NAPOLITANO: Do you believe the value would be different if it was valued at a

10  liquidation value?

11      KALTENBACH: I mean . . . based it could be higher, it could be lower just depends on the

12  time. If you would have sold stuff during Covid, you could have sold stuff for higher value. So it's

13  just speculative of what you're doing, when you're doing it and demand.

14      NAPOLITANO: Thank you.  Earlier on this call, or this Zoom meeting, the trustee opined

15  that the inventory value is approximately $15,000,000.  Do you have any reason to disagree with

16  the trustee valuation of the inventory at 15,000,000?

17      KALTENBACH: Again, I, I think it's speculative in my course of what it's worth, it's worth

18  what I put down, and the trustee, if she has her determination why she thinks it's worth less that's

19  that's her fact pattern and her determination.  I don't, I don't think they're apples to apples.

20      NAPOLITANO:  Okay.  So just so to confirm, your $31.8 million value was based on the

21  going concern value for the inventory?

22      KALTENBACH:     I did not say that. I said that it was ….

23      CURRY:     I object. You already answered that.

24      NAPOLITANO:     OK.  On Schedule D for Sub-Zero's claim, you listed Sub-Zero's

25  share of the inventory valued at $5.135 million.  How was that determined?

26      KALTENBACH:     Cost plus normal mark up.

27

28

**TRANSCRIPTION OF 341(a) MEETING**

BN 82841295v3

1    NAPOLITANO:        And then on April 4th, Steve Smith, the CEO of Pirch provided an

2  inventory report of Sub-Zero goods to Sub-Zero.  Did you have any involvement in preparation of

3  that report?

4    KALTENBACH:        I ran the report.

5    NAPOLITANO:        And the report listed inventory values of approximately $3.65

6  million?

7    KALTENBACH:        No it did not.  It listed extended costs of $3.65 million.

8    NAPOLITANO:        OK so that would be separate from …

9    KALTENBACH:  That would be book value versus cost plus normal margin, what would

10  be expected at retail.

11    NAPOLITANO:  OK, OK. I have no further questions. Thank you for your time.

12    TRUSTEE:  OK. Thank you, Mr. Napolitano.  Mr. Frank White?

13    WHITE:  Yes, thank you, Madam Trustee, and at your request I'm going to reserve a

14  number of questions until the resumption of the meeting on June 5th. But I did have one set of

15  questions that that could have some time, time sensitivity that I wanted to ask Miss Kaltenbach.

16  Miss Kaltenbach, are you aware at all of a credit card charge that was placed on a cardholder's card

17  on the day that the that the bankruptcy case was filed in the amount of $88,000?

18    KALTENBACH:        I, is there any particular, I'm not quite sure what you're referring to.

19    WHITE:        Well, I'm just asking if you're aware of credit card charges being placed on

20  customers' credit cards as late as the same day as the bankruptcy case was filed?

21    KALTENBACH:        It was my understanding firstly when I talk to people that I control

22  that the payment portal had been actually disabled.  So I'm not aware of any indication of credit

23  card payments being charged, so I I don't know.  I have no recollection of anything after we had

24  shutdown the showrooms.  I don't know exactly, but its my understanding that there were no further

25  credit card processing.  But that's just my understanding.  And what I saw on the bank records.

26    WHITE:        And I believe if I understand correctly your counsel mentioned earlier at the

27  meeting that some displays were sold in the week leading up to the bankruptcy case, is that correct?

28    KALTENBACH:        That is correct.

**TRANSCRIPTION OF 341(a) MEETING**

BN 82841295v3

1    WHITE:        Were any of those sales done to your knowledge by credit card?

2    KALTENBACH:        No, they were not by credit card to the best of my knowledge and my

3    review of the bank records.

4    WHITE:        Are you aware of any legitimate reason why a customer's credit card would

5    then be charged as late as the day or even the week that the bankruptcy case was filed?

6    KALTENBACH:        I am not aware of any, any charges of credit cards.  I don't know the

7    exact date, but I believe it's approximately around when we did the shutdown of the showrooms.  I

8    can get the exact dates, but I'm not aware of credit cards being charged even you know on the day

9    of the bankruptcy.

10    WHITE:        OK.  Madam Trustee, that's all I have for now.  I'll reserve everything else

11    until we resume on June the 5th.

12    TRUSTEE:        Alright, thank you.  I appreciate thatj, Mr. White.  And there was a request

13    of an emergency question by a David, it didn't say your last name on your chat.

14    YOUSEFFI:        Oh, my name is David Youseffi.

15    TRUSTEE:        Okay, go ahead sir.

16    YOUSEFFI:        Thanks, I just have a few quick questions.  One is, when did you consider an

17    item that's in your inventory, Pirch's inventory, when would you consider that be allocated to a

18    particular customer order?  At what stage? Or never?

19    CURRY:        I'll just jump in and object, but I think that's a legal question and I think that

20    the Trustee already looked into that.

21    YOUSEFFI:        Yeah, thank you.  So just to be clear…it's not a legal question [INAUDIBLE,

22    SPEAKING OVER EACH OTHER].

23    CURRY:        Do not interrupt.

24    [INAUDIBLE, SPEAKING OVER EACH OTHER]

25    CURRY:        I'm objecting, I'm gonna be talking so stop that.  For the record, I believe

26    this calls for legal question, Miss Kaltenbach, you are free to answer.

27    [INAUDIBLE, SPEAKING OVER EACH OTHER]

28

**TRANSCRIPTION OF 341(a) MEETING**

BN 82841295v3

Exhibit 1, Page 31

1    YOUSEFFI:    It's not a legal question, I'm asking if in the course of Pirch's business in the

2    normal course of Pirch's business …

3    CURRY:    Are you an attorney?

4    YOUSEFFI:    What does that? Let me ask the question please.  In the normal course of the

5    business, Pirch's business, when did it consider an item in inventory to be considered allocated to

6    a particular customer order.

7    CURRY:    Same objection. Please proceed, Miss Kaltenbach, if you haven't answered

8    that.

9    KALTENBACH:    So let's start with allocated versus not allocated is not a term a title

10    transfer.  Understand, just say that.  Product when brought in to Pirch's warehouse sometimes

11    would go, and I say this [INAUDIBLE] but often times it would get moved to different orders, the

12    customer might change, you know, their mind on the spec, or the, you know, the whole product

13    [INAUDIBLE] on completely the product movement between the warehouses was quite high,

14    depending on when that customer, you know, decided they, you know, project delay, when did they

15    need it, timing.  The term allocation is not really a title transfer and more of an indication of, this

16    might go eventually to this order.  But the amount of unallocation/reallocation, movement, was

17    quite, it's quite high.  Just depending on timelines and change orders, canceled orders, you know.

18    There's just a lot more background.  Again, allocated/not allocated and title transfer are not any

19    type of connection.

20    YOUSEFFI:    If a customer had been told that the item is ready for delivery and the

21    customer accepts or requests that delivery, at that point, is, and I'm not asking about title transfer

22    by the way, I'm just asking at what point does Pirch decide or did it decide when it was in business

23    that this item is now associated, allocated or otherwise deliverable to that customer?  So, more

24    specifically, if the delivery of the schedule do you consider it allocated or otherwise associated with

25    that order at that stage?

26    CURRY:    I'll just note for the record, I think the question is ambiguous. But, Miss

27    Kaltenbach, you can answer to the best of your ability.

28

27

**TRANSCRIPTION OF 341(a) MEETING**

1      KALTENBACH:    I'm just going to say again, title transfer occurs when product is

2  delivered and/or if (inaudible) a storage fee arrangement was done there potentially could be title

3  transfer.  But allocation even after scheduled, stuff gets moved around, warehouse to warehouse,

4  there is no -- once the customer says its allocated, that's not an end all be all

5      YOUSEFFI:  Even if it's scheduled for delivery?

6      KALTENBACH:    Even if it's scheduled for delivery, there can be modification on that

7  product. The biggest case is if there's four deliveries needed in one warehouse for products this

8  week and there's three products there and there's six on hand in the other warehouse they can, there

9  can be a schedule where there's for that one warehouse for the next week, and they take one product

10  from a warehouse and send it somewhere else.  So there's a lot of movement within the product

11  base, which means orders just depending on timing and when things fall.

12      YOUSEFFI:  When did you first become aware that Pirch was in financial distress?

13      CURRY:    I'll object.  I don't know what he means by "financial distress"?

14      KALTENBACH:    I would like some more clarification on that.

15      YOUSEFFI:  When did you know that – well, I think you're a CFO and you know what

16  financial distress is, I'd like to ask that question?  Or if you don't, if you never knew that the

17  company was in financial distress?  Answer that way.

18      KALTENBACH:    I'm gonna …

19      CURRY:    I still object.  I think financial distress is a projection bearing on numerous

20  terms and could be lawsuits, it could be so many different ways to define that, but Miss Kaltenbach

21  feel free to answer if you're able.

22      KALTENBACH:    When we temporarily made a decision to close the showrooms is

23  when I and the rest of the, I'm not speaking for them, but in my meeting with my co-officers it felt

24  like there was a path forward.  Before that it felt like there was a path forward.

25      YOUSEFFI:  When was the first time that you or any of the officers you spoke with talked

26  about or otherwise considered bankruptcy?

27      CURRY:    I don't think that question is necessary.  I think that [INAUDIBLE]

28      SPEAKER:  Well she's being evasive

**TRANSCRIPTION OF 341(a) MEETING**

BN 82841295v3

1    CURRY:    Please, please, please, please do not interrupt me.  I don't interrupt you.  Do

2  not interrupt me, I'm trying to do my job and maybe you don't understand that, I'm trying to do

3  my job here.  So I'm objecting to the question that I think is outside the scope of the 341(a) meeting

4  because it doesn't deal with assets and liabilities of the debtor.

5    SPEAKER:    Mr. Curry, just for comments here …

6    TRUSTEE:    Ok, again, I I'm sorry Mr. Iazonni (phoenetic), I just want to say something

7  first.  Again, I'm really asking I am already an over an hour behind on my examinations today.

8  This is just an initial meeting, it's already been over, well over an hour that we've been in this

9  meeting.  I understand all of you have questions, that's why I set a continued meeting which is just

10  for this case and also a continued and also a town hall where I can answer questions.  So please if

11  you could leave it to Judge I'm not finished Mr. Iazonni.  Please if you could leave it to an

12  emergency questions and PLEASE let the person finish speaking before you speak so that we have

13  an appropriate record of the goings on today. Mr. Iazonni.

14    IAZONNI:    Just a comment, everyone in this call especially the persons that bought

15  property for their own home at a loss. Just a little professionalism, Mr. Curry, would be appreciated.

16  You're the only person on this call who has been impatient.  Everybody else is at a loss and so

17  please a little bit of courtesy and a little bit of sensitivity would be greatly appreciated.

18    CURRY:    And I totally appreciate that and again, one of the main reasons the company

19  filed for bankruptcy was to allow a fiduciary like Ms. Gladstone to come in, see what value could

20  be created for the creditors, that's why the decision was made. And I don't have a problem with

21  that. I sympathize with people.  I would not want to be in the same situation because I know people

22  have lost a lot of money or may be losing a lot of money. But I have to do those.  I need to object

23  for the record because that's my job but I can be interrupted while I'm trying to do that.  So that's

24  all.  But I appreciate your comments.

25    YOUSEFFI:    I have one very short question, and if I could just get it out, I'll move on, or

26  let the proceedings move on.  I do consider these to be emergency questions so I appreciate the

27  courtesy.  The last question is did Pirch make any distributions, dividends, or other payment to its

28  owners in the past year?

**TRANSCRIPTION OF 341(a) MEETING**

1    KALTENBACH:       No.

2    YOUSEFFI:    Ok, thank you.

3    TRUSTEE:     Alright. I have another request for an emergency question by Spruce.

4    MS. MANNIS:       Hi, it's John and Shyla Mannis, and we purchased products from the

5    Costa Mesa store.  And as David asked, when did she know that Pirch was in financial distress, and

6    as her attorney said, you know, yadda, yadda, whatever.  But I'd like to add that she had to have

7    known something because as of 2017 there were clients that were already stating they were not

8    getting product.  And we all could do the research on this.  Everybody, I just Googled it.  And so

9    you had to have known something, Miss Kaltenbach, I'm so sorry if I'm butchering your last name.

10   You had to have known something.  Quite frankly, our sales rep looked at my husband and on

11   multiple times he said "are you sure you don't want to put this on credit card?"  My husband was

12   like no, write a check.  And the guy said, "are you sure?".  And my husband was like no it's okay,

13   we'll just write a check.  So that just tells me, because I mean I work for companies that were going

14   under and we all heard.  There was always struggling somewhere, so you had to have known.  And

15   I'm just curious.  When did you know?

16   CURRY:     I'll reassert the objection. The question is ambiguous and argumentative. I

17   don't think that's an appropriate question for a creditors meeting.

18   TRUSTEE:    Well, certainly the financial condition that the debtor is an appropriate

19   question Mr. Curry but however, I don't think it is an emergency question.  And I really do need to

20   get on.  I'm not trying to cut you short Mrs. Mannis but I really need to move on to my calendar.

21   So why don't we -- and I think that question has already been asked or she did ask answer it

22   somewhat, probably not in the detail that you would like and I'm happy to entertain those further

23   questions at our continued meeting.  If there -- I do not see any other requests for an emergency

24   question

25   SPEAKER:    Maam

26   SPEAKER2:   I have _____

27

28

**TRANSCRIPTION OF 341(a) MEETING**

BN 82841295v3

Exhibit 1, Page 35

1    TRUSTEE:    Please, again, there's a lot of people talking right now.  Please make sure

2  you are limiting this to an emergency question that you need the answer for today as opposed to

3  the continued meeting or the town hall that I have already scheduled.  Okay.  Mr. Laniado.

4    LANIADO:  Thank you, thank you.  Good work to everybody.  I was saying to Mr. Tony

5  Napolitano and I don't have any experience in legal things. I want to know if he can represent my

6  case or I need to have a lawyer or how does this work?  It's the first time for me that I am in

7  something like this.

8    TRUSTEE:    I didn't…that's not something that I can answer for you Mr. Laniado.  If

9  whether you need a lawyer or not, it's -- I don't even know what your situation is.  Mr. Napolitano

10  represents Sub Zero which is one of the vendors involved in the case and I'm not sure that it would,

11  that it would pertain, but I'm assuming he's on the line and he can get in touch with you if that is

12  appropriate.  Is there another emergency question for Ms. Kaltenbach?

13    NAPOLITANO:  Yes, to clarify, I am not able to represent any other party in this case.

14    SPEAKER:    We have an emergency question?

15    SPEAKER3:    Madame Trustee can we ask an emergency question on timing of material?

16    TRUSTEE:    Okay, I'm not sure who is speaking, but I believe Ms. Ockerman came up as

17  being highlighted to me so did you have a question?

18    MS. ACKERMAN:  Yes, good morning.  Thank you.  So for the consumers here, what

19  would be the timing if there is payment of distribution or the availability of the inventory?  We're

20  just trying to move back into our home while trying to figure out if we need to purchase somewhere

21  else or if this would be available within the next couple of weeks or are we looking at months?

22    TRUSTEE:    Well, they, the hearing, I can answer that.  The hearing on the motion to sell

23  the inventory is June 24th.  That just allows us to, gets court permission for the, I need people not

24  to speak when I'm speaking please.  That allows the court to give the -- to allow the court

25  permission for the sale process, which will be a combined online auction and a and bulk sales, bulk

26  sales.  So it likely is not going to be in the next couple of weeks.  I can't even get court permission

27  that quickly.  But there will be an opportunity to purchase for online purchasing at the auction as

28  part of the sale procedures assuming it is approved by the court.

**TRANSCRIPTION OF 341(a) MEETING**

BN 82841295v3

1    ACKERMAN:  Yeah, this is Ryan Ackerman; Dee's husband.  So what you just said its

2  sounds like there's going to be no picking up of existing inventory, so we can move my, other than

3  showroom finished product, so we'll just be [INAUDIBLE] depending on the outcome of your

4  investigation.

5    TRUSTEE:    That's what I have asked the court to do because of the discrepancy between

6  what is available online and the amount of orders that there are, it just doesn't, it wouldn't, there's

7  not enough.  So I have asked for the sale to occur that way but do -- it is required to have court

8  approval.  So that's all laid out in the motion that you should have a copy of if you want to take a

9  look at that.

10    SPEAKER:    Question here, is there any advantage?

11    TRUSTEE:    Okay, who's speaking please?

12    SPEAKER:    This is Mr. Fred Mayfield [INAUDIBLE] and my question is I have a lawsuit

13  against Pirch, and a court dates on July 3rd. Is there any point of continuing the lawsuit in light of

14  the bankruptcy, bankruptcy, bankruptcy, bankruptcy.

15    TRUSTEE:    There's a lot of feedback on your line but I think what you're asking is that

16  and maybe you can mute this one because it seems to where the sound is coming from.  The, first

17  of all, you're not permitted to continue with a lawsuit when a bankruptcy is filed.  There's an

18  automatic stay and that prevents anybody from continuing or starting a lawsuit.  So, that's probably

19  the short answer to your question and again, I'm happy to take up all of these things in the town

20  hall on Friday.  Is there some other question needed today, any questions of this?

21    BUCHE:    I have one question.

22    TRUSTEE:    And your name sir?

23    BUCHE:    John Bouche.  Pirch gave customers specific product serial numbers linking

24  it with exact product in their warehouse. Were they selling specific serial numbers multiple times

25  or is that, is that serial number specific to a certain invoice?

26    TRUSTEE:    I mean, I'm, we are still looking into this but my understanding is that they

27  did not list serial numbers in their contracts so it was not the way that they …

28    BUCHE:    They gave customers serial numbers, specific serial numbers.

**TRANSCRIPTION OF 341(a) MEETING**

BN 82841295v3

Exhibit 1, Page 37

1    TRUSTEE:    Well, if you have something like that that you want to show me Mr. Bouche,

2    I'm happy to look at it, but it's not my understanding of how they normally did business.  But I'm

3    happy to look at what you've got.  Okay?

4    SPEAKER:    I have one question.

5    TRUSTEE:    Okay, Ms. I believe it's Ms. Poria, you have a lot of feedback on your line

6    mam but we'll give it a shot if we, if you can, maybe you have more than one device open which

7    might be causing your feedback.  I already muted you once because of that.  Okay, go ahead.

8    MS. PORIA:    [INAUDIBLE]

9    TRUSTEE:    I'm sorry, I'm sorry to interrupt you.  I can't hear anything your saying, it's

10   very faint and muffled.

11   MS. HARDING:    [INAUDIBLE] Can you hear me better?

12   TRUSTEE:    Uh, with an echo.  Go ahead, we'll try. Why don't you try.

13   SPEAKER:    I'll record this.  There's seems a _____  and they have _____

14   [INAUDIBLE]

15   TRUSTEE:    Do you understand the question Ms. Kaltenbach?

16   KALTENBACH:    I think she asked and you can correct me if this is wrong, after we

17   decided to temporarily shut the showroom and logistics down, if somebody demanded product and

18   why we didn't release it to them?

19   MS. HARDING:    Yes.  At that moment, at that time you were not [INAUDIBLE AND

20   INTERRUPTION] Subzero had delivered that [INAUDIBLE]?

21   KALTENBACH:    Okay, so those are two different questions.  The first one I'd say that,

22   up until the time we shut the showrooms down, there was alternative paths outside of just

23   bankruptcy that we were going down.  As far as post-the shutdown of the showrooms and halt of

24   all operations, we were working with counsel and financial advisors of how best to move forward

25   and ultimately, trying to get into the Chapter 11 without utilizing funds from certain aspects that

26   were already with the customers, i.e. like the inventory which … but for us, at that point, we decided

27   just to completely halt all operations because how, you know, how do you orderly pick and choose

28   customers to get product to when you have a large outstanding balance and consumers that you

**TRANSCRIPTION OF 341(a) MEETING**

1   have homogenous requests for, you know, if you have 10 refrigerators on hand and 30 requests for

2   them. So at that point we decided to halt all operations.  Did that answer that question?

3          SPEAKER:   [INAUDIBLE]

4          TRUSTEE:   I'm sorry, who is speaking please?

5          SPEAKER:   Lawrence _____

6          TRUSTEE:   Lawrence what?

7          LAWRENCE: [INAUDIBLE]

8          TRUSTEE:   Okay, you've got a lot of feedback on your line as well, but we'll give it a

9   shot.

10         LAWRENCE:  Okay, after the showrooms closed, we were given an email addressed to use

11   to find the status of orders and I'm sure a lot of people put those queries into the email address for

12   open matters at Pirch.com or something like that.  I never received a response and so what happened

13   to that system? I assume it has now been closed down but it seems there's been an effort to try to,

14   you know, assist customers with that emergency system apparently failed. Do you have any

15   comments on that?

16         KALTENBACH:   I did not oversee that.  It was my understanding that the system was

17   set up to address, to have feedback, to have connections with customers.  I'm not sure what did or

18   didn't get answered.  It was my understanding that there was significant effort to human-answer

19   responses but I don't' know, I didn't oversee that effort.

20         TRUSTEE:   Okay, I just have a couple of …

21         SPEAKER:   I have one quick question.

22         TRUSTEE:   Is it an emergency Mr. Espy?

23         ESPY: Yes, yes it is.

24         TRUSTEE:   Go ahead.

25         ESPY: One note, at the _____ person, they have two events open, that is what is causing

26   the feedback problem.  The question is, so I'm a consumer like a lot of people on this line, and

27   obviously a lot of us have been not through this and we're confused; is it correct to help us

28   understand, Ms. Gladstone, that there's basically almost no chance that we'll get delivery of

34

BN 82841295v3

1    inventory so we need to move on and buy it from somewhere else if we need it for our homes sort

2    of thing. We just need to wait for this to settle and then potentially get money, but it will probably

3    be very minimal. Is that the reality of this?

4    TRUSTEE:    Well, again, I did already answer that.  I think that's a question for me. We

5    have submitted that is all in the motion and the motion is before the court on June 24th. I can't

6    speak to what the judge is going to do, but that is what I've asked for is for the inventory to be sold

7    and and the money to be available so that the all of the expense doesn't go to the landlords for the

8    amount of rent that's being incurred monthly for to house all of this stuff.

9    ESPY: But my question was for people that are holding out hope that they'll get delivery

10    of their product, there's no hope for that, correct?

11    TRUSTEE:    I don't know that because the judge has not ruled. I don't, I'm not a judge. I

12    can only, I can only provide the judge what I think should happen and then the judge has to make

13    the decision, and that is on June 24th.  I expect, and I don't think that's going to happen because

14    there's too many customers and not enough inventory so it would just be mayhem in my opinion.

15    But, so I don't really see any other reasonable approach other than what I'm doing but it will be the

16    Judge's decision.  Okay, so I'm going to go ahead and -- I'm going to go ahead and shut down the

17    emergency questions right now because I haven't found that any of them have really been truly

18    been an emergency.  And we are going to have a continued meeting on June 5th.  So then I'm going

19    to continue this meeting at this time.  I do need to ask are there any creditors wishing to call for an

20    election to call for a new Trustee?  That's a requirement that has to be done today.  No. Not hearing

21    anyone.  Alright and then also if there's anyone, is there anyone calling for the appointment of the

22    creditors committee?  Not hearing anyone on that either.  OK, So what we're going to do for today

23    is I'm going to continue this to June 5th at 2:30 and it will be on the same login and password as

24    today.  That that will be questions that anybody wants to have of Miss Kaltenbach or if Mr. Smith

25    is available that day he may be here as well.  I don't know, that would be up to Mr. Curry as long

26    as a representative is is present on that day. But sounds like maybe that might be a good idea for

27    him to be there. And I will also be posting on the website the information for the town hall which

28    will be May 31st at 9 a.m.  I will read out the website one more time for you now but it again it and

**TRANSCRIPTION OF 341(a) MEETING**

BN 82841295v3

1    you can call that the number (858) 247-0750 if you don't get the website.  Website is

2    https:\\pages.trustesolutions.com\TrusteeGladstone.

3         Speaker:    I would like to call for a creditors committee, at least for the group of

4    consumers. I think that could be helpful.

5         TRUSTEE:    OK. Ms. Hong, are you on the line?  Ms. Haeji Hong?

6         HAEJI HONG:        Yes, this is Haeji Hong of the United States Trustee's Office. With

7    respect to the creditors committee and there are enough creditors who wish to allow the creditors

8    Committee, I do have to do it on the record and Miss Gladstone has stated she has, she actually has

9    quite a few cases that started at 8:30 and 9:30 that she is quite late.  So at this time, I'm not sure we

10   could do it today. So I would suggest that we can move that if the creditors are interested, do it all

11   on the continued date that Ms. Gladstone has suggested on June 5 at 2:30 p.m.

12        SPEAKER:    That's great.

13        TRUSTEE:    Okay.

14        HONG:        We should understand that the creditors committee is not the, if they hire any

15   professionals, they cannot be paid from the estate. But we can go over that on the June 5, 2024 at

16   2:30 p.m.

17        SPEAKER:    Thank you.

18        TRUSTEE:    OK, so that would be also continued to June 5th at 2:30 PM.  And I believe

19   that ends the meeting for today then. And thank you all for attending and I hope to see you all on

20   on the Zoom, Zoom on Friday.  Again that that Friday meeting for the town hall will not be on this

21   Zoom because I'm not permitted to use it for that purpose.  I have another Zoom account and that

22   will be information on the login and password will be on the website. Okay, thank you all very

23   much.

24        SPEAKER: Thank you.

25

26

27

28

**TRANSCRIPTION OF 341(a) MEETING**

BN 82841295v3

Exhibit 1, Page 41

1   Proceedings recorded by electronic sound recording;
2   Transcript produced by Buchalter, A Professional Corporation.

3   Recorder:                          Leslie T. Gladstone, as Trustee
                                       Office of the United States Trustee
4                                      Southern District of California

5   Transcription:                     Buchalter, a Professional Corporation
                                       1000 Wilshire Blvd., Suite 1500
6                                      Los Angeles, CA 90017
                                       (213) 891-0700
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

37

**TRANSCRIPTION OF 341(a) MEETING**

BN 82841295v3

# EXHIBIT 2

1  ANTHONY J. NAPOLITANO (SBN: 227691)
       anapolitano@buchalter.com
2  BUCHALTER, A Professional Corporation
   1000 Wilshire Boulevard, Suite 1500
3  Los Angeles, CA  90017-1730
   Telephone: (213) 891-0700
4  Facsimile:  (213) 896-0400

5  DENISE H. FIELD (SBN:  111532)
       dfield@buchalter.com
6  BUCHALTER, A Professional Corporation
   425 Market Street, Suite 2900
7  San Francisco, CA  94105-2491
   Telephone: (415) 227-0900
8  Facsimile:  (415) 227-0770

9  Attorneys for secured creditor
   SUB-ZERO GROUP, INC.

10

## UNITED STATES BANKRUPTCY COURT

11

## SOUTHERN DISTRICT OF CALIFORNIA

12

| | |
|---|---|
| In re | Case No. 24-01376-CL7 |
| PIRCH, INC., | Chapter 7 |
| Debtor. | **341(a) MEETING TRANSCRIPT** |
| | **Meeting of Creditors:** |
| | Date:        June 5, 2024 |
| | Time:        2:30 p.m. PDT |
| | Place:       via Zoom.us |
| | Judge:       Hon. Christopher B. Latham |

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

**TRANSCRIPTION OF 341(a) MEETING**

1

TRANSCRIPT OF 341(a) MEETING OF CREDITORS
Case No. 24-01376-CL7
June 5, 2024 at 2:30 p.m.

2

3   Debtor's Representative:                Mekall Kaltenbach

4   Counsel for the Debtor:                 K. Todd Curry, Esq.

5   Chapter 7 Trustee:                      Leslie T. Gladstone, Esq.

6   Counsel for the Chapter 7 Trustee       Christin Batt, Esq.

    Counsel for Secured Creditor            Anthony J. Napolitano, Esq.
7   Sub-Zero Group, Inc.:

8   Counsel for the United States Trustee   Haeji Hong, Esq.

9   Various Other Parties Appeared as
    Stated on the Record

10

11

12          [341(a) Meeting started at 2:30 p.m.]

13          . . .

14          [The following transcription is from the hearing audio starting at approximately 6:31 p.m.,

15   audio file time stamp 4:01:00]

16          ANTHONY J. NAPOLITANO:  Thank you Miss Gladstone, I'll just lower my hand here,

17   and thank you for calling us here today to testify on behalf of debtor.  A couple of questions, you

18   had mentioned earlier that the debtor consulted with Hilco and Gordon Brothers prior to the filing

19   of the bankruptcy case, what was the purpose of that consultation.?

20          MEKALL KALTENBACH:  There was a discussion whether or not they would, are going

21   to be liquidator and provide either upfront financing or DIP financing, so that potentially Pirch

22   could get into a Chapter 11 filing and then at one point at least one of them offered to buy a

23   substantial amount of inventory for a very low amount and it was just our understanding, being

24   advisors, that it it just, it didn't, it wasn't reasonable to acceptable such a low bid offer for for, uh,

25   well. You represent Sub-Zero, right?

26          MR. NAPOLITANO:  That is correct.

27          KALTENBACH:  It would be, you know, the offered to buy products that you just never

28   really see those kind of offers in the normal stance.

2
**TRANSCRIPTION OF 341(a) MEETING**

1    MR. NAPOLITANO:  Do you recall what the percentage, or flat amount was for, that

2    potential purchase?

3    KALTENBACH:  I don't recall, but again it was going to be pre-bankruptcy, so it was my

4    understanding that it would have a based a huge risk factor on it because of potential for fall out.

5    MR. NAPOLITANO:  Do you recall if it was Hilco or Gordon Brothers that had made that

6    [INAUDIBLE].

7    KALTENBACH:  I can't recall which one it was.

8    MR. NAPOLITANO:  And were you looking to retain either one on a mutually exclusive

9    basis or would they have been working with the debtor in tandem?

10    KALTENBACH:  It was basically getting into a Chapter 11 and working with basically the

11    debtor and creditor and like cause' you're representing a secured party, I think there was, you know,

12    kind of working through everything in the best possible way, the, but, the idea here was to get either

13    a pre-chapter financing or DIP financing to actually be able to run a chapter 11.

14    MR. NAPOLITANO:  Did they come to you and end up doing an inventory inspection at

15    all?

16    KALTENBACH:  No.

17    MR. NAPOLITANO:  Did the Debtor provide them with any inventory reports upon which

18    they could base their potential offers for liquidation?

19    KALTENBACH:  Yes.

20    MR. NAPOLITANO:  Did—take them one by one—did Hilco provide any reports to the

21    Debtor outlining what the anticipated recovery might be in a pre-bankruptcy or a bankruptcy

22    liquidation sale?

23    KALTENBACH:  I can't remember which one—Hilco or Gordon Brothers—but basically

24    the only thing provided was a very big high risk premium pre-bankruptcy so . . .

25    MR. NAPOLITANO:  Did they offer less than 50%, if you could remember?

26    KALTENBACH:   Yeah, yeah it it was, uh, it would have been—I think they would have

27    picked everything up and it, but, it was—we were told that these places did have high risk premium

28    attached to it and was substantially less than if anybody would have ever [INAUDIBLE].

3

**TRANSCRIPTION OF 341(a) MEETING**

MR. NAPOLITANO:   And do you recall over what time frame they would do the liquidation sale?

KALTENBACH:  I don't.

MR. NAPOLITANO:  Did the debtor have any conversations pre-bankruptcy with Onyx Assets Advisors, the broker that trustee proposes to use for this liquidation sale in the Chapter 7 case?

KALTENBACH:  I, I'm not quite positive. The name somewhat sound familiar so I would have to go back and look, um. Will dillard also had conversations about obtaining an ABL before he even really chose [INAUDIBLE] so I'd just have to look. I don't have any ongoing relationship with any of them anymore. I haven't had a discussion post, you know, the filing or anything like that.

MR. NAPOLITANO:  Ok.  Did you have any reports from either Hilco or Gordon Brothers or Onyx—or should I say, does the Debtor have any reports—that would you be willing to provide those to the trustee and her counsel and the debtor's counsel for provisions of the creditors?

KALTENBACH:  Yes. I mean I would have to understand, you know, if those are required because again those do have a lot of subjectivity around them but they are high risk premium and then, um, in my opinion should not be taken as literal, so I would highly put a huge risk premium on them in my opinion.

MR. NAPOLITANO:  And what factors would you say, in your opinion, go into that risk premium?

KALTENBACH:   Well, I think you're kind of hearing them in my opinion. Uh, [INAUDIBLE] Leslie Gladstone's motion to sell the inventory made clear who has rights over the inventory in the warehouse. INAUDIBLE]. There was a lot of different opinions, um—title transfer, secured debtor, secured debtor claims, the overall creditor claim—so in my opinion for somebody to come in and roll in, buy any inventory that has that much subjectivity to who thinks they're owning IT is a very high risk factor.

MR. NAPOLITANO:  Ok. Let's talk about some of the locations and just TO get an understanding.  So if I understand from your prior testimony there's the new goods the A stock --

**TRANSCRIPTION OF 341(a) MEETING**

1    there's B stock which tends to be more of the obsolete goods, and then there's open package goods,

2    customer returns and then there's also display units.  Is that a correct assessment?

3        KALTENBACH:  Yes, um, display though can have various forms. It can be new. It can

4    also be used. It could be highly used, um, a highly useful way I think about it—but used for demos

5    and stuff like that, so there can be forms of that. And then there's a small amount of consignment

6    assets at a different location, pretty small in the grand scheme of things. And then various, you

7    know, other inventory which is mostly like, like loaders and stuff where they keep the fridge, there's

8    like these different operating in case somebody wanted to [INAUDIBLE] and stuff like that.

9        MR. NAPOLITANO:  Ok, and then in the ordinary course of business, was any A-stock

10    kept at any of the retail showrooms?

11        KALTENBACH:  It's my understanding that there wouldn't be significant—there could be

12    something one off like some kind of—somebody like a small vendor dropped off, you know,

13    hardware for a customer. But not in the normal course of business. I can't caveat that it never

14    happened but that was not, you know, the idea of normal course of business, to have A-stock in the

15    showroom.

16        MR. NAPOLITANO:   And how about B-stock? Would you have B-stock out in the

17    showrooms?

18        KALTENBACH:  Technically, it would just become B-stock, or if somebody returned

19    products and it was sitting in the back, it was typical to try to keep that cleared out because there

20    wasn't a whole lot of storage room for returns that, you know, you can consider B-stock potentially.

21    But, you know, depending on the showroom there were certain things that could end up in the back

22    warehouse but in my opinion, in the grand scheme of things, it wasn't like a point how, um, to have

23    significant amount of B-stock and returns in the showroom.

24        MR. NAPOLITANO:  Ok. So to go through a few of the locations, I understand that the

25    Costa Mesa, the Rancho Mirage and the Mission Viejo locations are the subject of the Trustee's

26    sale and assignment motion. Is it safe to say that all the display units are fully intact at those

27    locations, that none of the pre-bankruptcy sales that occurred, occurred in those locations?

28

**TRANSCRIPTION OF 341(a) MEETING**

BN 83022340v3

Exhibit 2, Page 48

KALTENBACH:  It is my understanding that those are intact, with the one caveat that the Mission Viejo cameras—and that was part of our litigation against Mission Viejo—is that the cameras were made inoperable. I believe that, based upon our strong encouragement not to do anything to the showrooms, that they understood that they should not proceed forward with any type of movement but it's my understanding that those were attached to that part [INAUDIBLE] and that Pirch employee and personnel were actively doing [INAUDIBLE] in the showroom.

MR. NAPOLITANO:  The sales to Discount Pros—was that primarily of showroom units at the other locations or did it include any other units at the primary distribution centers?

KALTENBACH:  It's my understanding that they were display units in the showroom—in the non-three we just discussed.

MR. NAPOLITANO:  So that would be Laguna, uh. . .

KALTENBACH:  Not Laguna. Laguna actually was a different fact pattern where the showroom was, uh, you're moving space at that showroom [INAUDIBLE] products were actually pulled out of that showroom prior to any of the times I'm talking about. But that's a very different fact pattern.

NAPOLITANO:  Ok. Do you know where those products went, sorry to interrupt, do you know where those products ended up?

KALTENBACH:  It's my understanding that they went to one of the warehouses and a chunk of them were sold in the process of selling B-stock in this way.

NAPOLITANO:  Ok.  Solana Beach—was that one of the ones that was [INAUDIBLE] to Discount Pros?

KALTENBACH:  It is my understanding that there were because there's a couple locations in Solana Beach.  There's a location inside a location. There's the main client showroom and there's the main plumbing and outdoor showroom.  It's my understanding that there were assets attained from the plumbing outdoor showroom and the client showroom. I do not believe the third location did I'm not positive about that. I think that one still has stuff in it. And then the UTC showroom and then the Glendale showroom.

**TRANSCRIPTION OF 341(a) MEETING**

BN 83022340v3

1   NAPOLITANO:  So the La Jolla UTC, the Solana Beach client showroom, and the Glendale

2   showroom—those display units were substantially sold to the Discount Pros?

3   KALTENBACH:  The La Jolla I, so—Solana Beach, UTC, Glendale.

4   NAPOLITANO:  OK

5   KALTENBACH:  Solana Beach, I don't know if you're familiar, it's just it's kind of like all

6   close together.

7   NAPOLITANO:  OK well is La Jolla the UTC?

8   KALTENBACH:  So UTC is San Diego. I think—is it technically La Jolla?

9   NAPOLITANO:  I don't know, it's kind of nearby?

10   TRUSTEE:  They like to claim it is, but I don't know. Some people would differ.

11   NAPOLITANO:  Anyway. Ok. So those three showrooms: UTC or San Diego…

12   KALTENBACH:  I think Solana Beach is too, but yes, those 3 geographical areas are the

13   same.

14   NAPOLITANO:  …were primarily sold to . . . ?

15   KALTENBACH:   Yes. Certain items were primarily sold to Discount Pros.

16   NAPOLITANO:   Then the Bradshaw sales to the B-stock units to various buyers. Were

17   those consumers or were they resellers?

18   KALTENBACH:  I, I believe the majority of it, I would have to look at, were to normal

19   course B2B sellers where they had, you know, they typically bought from us and turned around and

20   either did what they did. I, you know, the normal, acquired B-stock sales that we would see—I'm

21   not sure if you're familiar with B-stock platforms.

22   NAPOLITANO:  From comparing the GAAP position cost of the B-stock unit I imagine

23   that at one point it was an A-stock unit that became obsolete. Is that how it became new B-stock…

24   KALTENBACH:  It just depends.

25   NAPOLITANO:   … B-stock that was returned to a customer—sorry, by a customer.

26   KALTENBACH:  Either be an obsolete unit, generally speaking a lot of, especially given,

27   you know, the high demand at one point, a lot of its either like still damaged or, you know, single

28   ticket, or, you know, cosmetic minor damage. It could be for whatever reason, you know, end up

7

**TRANSCRIPTION OF 341(a) MEETING**

1  lost, or could be used, you know, a cancellation where, you know, Pirch kind of forced to take the

2  cancellation for whatever reason. So certainly things like that. Or sometimes, they would just be a

3  display or B-stock.

4      NAPOLITANO:  And do you have a sense as to what the recovery would be for a sale of

5  the stock unit versus its acquisition cost for Pirch?

6      KALTENBACH:  I did want to clarify that when you asked me a question on the last

7  meeting, I actually thought of this afterwards. Are you referring to the recovery rate of the majority

8  of the inventory listed at the expected retail and that that is the main inventory or A stock, referring

9  to the expected cost plus reasonable margin? For instance, display that is not already included in

10  the real estate discussions because it's hard to bifurcate the display unit and I, I, I don't really call

11  them inventory until they're actually available for sale. But those that are truly available for sale

12  outside of the showrooms—those were at 10% of its expected costs. And then other inventory was

13  at 10% of its expected cost and then return appliances were at 20% of expected cost and everything

14  else is at 10% of expected cost and, you know, with some of this being, you know, it just depends

15  on funding versus what we can actually get.

16      NAPOLITANO:  Sure, when you say "10%, 20%" are you talking about 10% below

17  extended cost?

18      KALTENBACH:  Of extended cost. And that's why I want to clarify. Obviously in the

19  grand scheme of things, when true expected resale value, I believe it ends up being like 96% of that

20  main inventory, "A"-inventory, but when we breakdown the various components, like that expected

21  value comes from the book value, it's I think like 78%.  So I just wanted to clarify the whole

22  inventory base is not at expected plus margin [INAUDIBLE].  The "A" inventory is extended plus

23  margin.

24      NAPOLITANO:  This goes back to that tag line between the 28 million and the 31 million

25  on the inventory values book value versus 31 million for…

26      KALTENBACH:  Well it doesn't break down exactly because there's obviously a lot higher

27  book value for display versus returns and then there's book value by first expected resale versus

28  main inventory, grade A or higher, effective retail versus book value…

**TRANSCRIPTION OF 341(a) MEETING**

BN 83022340v3

1    NAPOLITANO:  Ok. That's uh, just to follow up on that point, we talked about it briefly at

2    the last 341(a) but if this was, these sold through a different channel than through the retailer such

3    as Pirch in the ordinary course of business, those valuations necessarily wouldn't hold up.  Is that a

4    fair statement?  For example like with Gordon Brothers and Hilco, you know, they, through a

5    liquidation sale gave you a distressed pricing of less than 50%. The way you valued these for the

6    purposes of schedule A/B through the bankruptcy petition, I view as being valued as an ordinary

7    course or ordinary holding valuation. If it's a liquidation, those value would be…

8    TRUSTEE:  Are you providing an expert opinion, Mr. Napolitano?

9    NAPOLITANO:  I am.

10    TRUSTEE:  Ok. Do we need to go through your expert qualifications?

11    [LAUGHTER]

12    EVE KARASIK:  I'm sorry, I'm sorry, to interrupt, again. I am Eve Karasik, counsel for

13    Mekall Kaltenbach, and I just want to note for the record, she indicated that she had a hard stop at

14    six o'clock. She's been kind enough to go on after almost seven, I don't know how much more time

15    she has and unfortunately a good part of the day I understand was taken up by the election but she

16    spent almost, you know, five hours now on it so I hope that we will be able to you know wrap this

17    up fairly quickly.

18    TRUSTEE:  Seems like a reasonable request, Ms. Karasik. I agree.

19    NAPOLITANO:  Understood.  Thank you, Eve. If you just, if you can just opine on that,

20    that question and I just have a couple more follow up questions, real discreet ones on the L Catterton

21    transaction.

22    TODD CURRY:  I think it calls for speculation of the different sales scenarios, but go ahead

23    and answer.

24    KALTENBACH:  I did put this in the document. I listed everything at expected retail based

25    upon my best information and that's the information I got, the liquidator expert finding, so I did

26    not appraise anything you know based upon even thinking about that.  I listed them based upon

27    what I saw as the value based upon my experience

28

**TRANSCRIPTION OF 341(a) MEETING**

BN 83022340v3

1    NAPOLITANO:  Ok. Thank you.  Just a few questions on L Catteron and CP Fixtures

2 Holdings. The transaction at June 2020—would you characterize that as a leveraged buyout?

3    CURRY:  Objection, the extent it calls for a legal conclusion.  You can answer it.

4    KALTENBACH:  I, I, I, never thought of that. So I don't have a response to that.

5    NAPOLITANO:  OK.  You had mentioned that there was an option to convert equity to

6 debt.  That $81 million secured claim amount is that—did any new money come in with that

7 transaction or was that $81 million transaction solely a conversion of equity?

8    KALTENBACH:  Again, I mentioned this earlier. There are two components.  There is a

9 convertible debt piece, debt convertible to equity, and there was an equity piece. The different

10 convertible debt to equity, it's my understanding of how I view it, in my summarization that was

11 written down and then the equity was officially was turned over to the four officers.  That's my high

12 level summary of a complex process.  [INAUDIBLE]

13    NAPOLITANO:  Understood.  Sounds like a very complicated transaction.  At the top level

14 did any money come in from L Catterton or CP Fixture Holdings in June 2020 as part of this?

15    KALTENBACH:  No.

16    NAPOLITANO:  OK.  And as a now a debt instrument owed to CP Fixtures Holdings did

17 the debtor make any payments to CP Fixtures Holdings to service that debt in 2020, 2021 2022?

18    KALTENBACH:  I haven't read the records. We did make some interest payments, I would

19 have to look at exactly when we made those.

20    NAPOLITANO:  Do you happen to know what the amounts of these interest payments

21 might be?

22    KALTENBACH:  I think it's around 350, but I would have to look again. I would have to

23 look at that timeline.  They should be a part of the disclosures that are given to those payments that

24 I would have to make to the Trustee, I believe.

25    NAPOLITANO:  [INAUDIBLE] amount of those payments going to be?

26    KALTENBACH:  [INAUDIBLE]

27    CURRY:  Those were in the ordinary course. I don't know if they were in the disclosures

28 or not.

**TRANSCRIPTION OF 341(a) MEETING**

1    KALTENBACH:  Ok. Well those, yea, I just don't know—I would have to look at what
2    those look like, but they were some interest related payments.

3    NAPOLITANO:  Just to clarify, you said the number 350. Was that 350,000?

4    KALTENBACH:  I believe it's 350.  I'm not quite sure. Either 350 or 375 is what I think,
5    but I would have to look back and clarify with the records and how many they actually made.

6    NAPOLITANO:  Is that a monthly basis?

7    KALTENBACH:  It was on a quarterly basis but again I would have to look at the records
8    to see when those payments were made and how much they were made.

9    NAPOLITANO:  If you recall, do you have a sense when those payments stopped from
10   2020 to 2023?

11   KALTENBACH:  I believe it was in '23, but I'd have to look at the records again.

12   NAPOLITANO:  And was CP Fixtures Holdings—did that entity hold the equity that was
13   converted pre-transaction or was it L Catterton that held the equity?

14   KALTENBACH:  Um, all of the positions of L Catterton in my understanding were always
15   held by CP Fixtures Holdings.

16   NAPOLITANO:  And then at the time this transaction was done did the company retain any
17   financial advisors to give a fairness opinion or anything of the like?

18   KALTENBACH:  There was counsel that was hired for the company and then there was a
19   valuation done—a third party valuation—and then there was some work on the tax side to with a
20   central—basically a, what's it called a 372 review? I'd have to look at the official review just to
21   make sure…

22   NAPOLITANO:  Do you know the name of the firm that did the valuation analysis?

23   KALTENBACH:  I could get it, I can't remember on the top of my head, I apologize.

24   NAPOLITANO:  That's OK.  Understandable.  One last question, brought up in terms of
25   whether the Debtor had audited financial statements or not, you had mentioned in the last 341(a)
26   that you had an outside accountant Cohn Resnik. Did they do a review or a compilation of financial
27   statements on an annual basis for the debtor?

28

11
**TRANSCRIPTION OF 341(a) MEETING**

1    KALTENBACH:  No we were attempting to finish audits for them but again the point you

2    made earlier about some of the shortfall in the accountant's staff in 2020 and 2021, there was a

3    clean-up effort and we didn't end up completing the audits before it made sense to start working on

4    the next year audits. So, we did one in 2018 but they didn't do any review or compilation work—

5    the internal staff did all of the month end close

6    TRUSTEE:  Ok. I think I think we're going to stop at that point because this is, it does seem

7    like it's been a very long meeting and without even hardly any breaks.  So I and I apologize to the

8    few of you that didn't get to your questions and it looks like I'm going to need to continue again on

9    that basis. I was hoping not to do, but so…

10    KARASIK:  Is there some way to limit the next meeting to these four people who didn't get

11    a chance so we don't open up the room all again and start from the beginning because it's really

12    notb it's not what purpose of the 341(a) meeting is to you know let everybody keep asking questions

13    over and over and over again.  Or at least limit the time to an hour or something to that effect.

14    TRUSTEE:  Well, I definitely—unless you want to start a host of 2004 exams I don't I don't

15    think that's going to …

16    KARASIK:  I'm not sure that this is going to stop that.

17    TRUSTEE:  It may not.  I guess I don't I'm not sure I agree with you that it is only for these

18    people.  I mean there could be other people that have that have questions or that couldn't make it

19    today or whatever it is.  So I don't, I mean I don't know I don't know that I can do that really. I'm

20    going to, I hear you and it's …

21    KARASICK:  We just don't want to have another five hours. I mean Miss Kaltenbach is no

22    longer employed, she's not getting paid, she understands her responsibilities, she's been very

23    responsive, she spent quite a bit of time and you know another five hours out of her life is a lot

24    so…

25    TRUSTEE:  I agree, I agree with all of that and I don't know that there's much I can do

26    about it but because there are you know legitimately a lot of questions that that people have

27    MARSHALL KRUPP:  Miss Gladstoneb might I suggest that this process might be more

28    expeditious if Mr. Smith was in the room answering some of these questions that Ms. Kaltenbach…

**TRANSCRIPTION OF 341(a) MEETING**

BN 83022340v3

1  TRUSTEE:  I can't, I can't compel him to attend it has to be a responsible officer and she

2  has been able to answer the majority of the questions.  So, I mean it may be that it may be that it

3  causes—you'd have to do a 2004 examination of him because he hasn't attended, but it likely will

4  be that, but I can't I can't require him to attend here.

5  MALE VOICE:  And this has been, I'm just going to respectfully object to the request to in

6  any way limit the time on the film but a number of people ask questions you know, tens of millions

7  of dollars of consumers' money has disappeared here so I think we're more than entitled to the

8  exam.

9  CURRY:  I just want to note for the record we're imposing upon Ms. Kaltenbach so there's

10  a there's a balance that I'm trying to strike and I've explained to her my needs to do my job I need

11  her help.  I don't know where the line is but at some point I think she's going to want to move on

12  with her life.  She's not being compensated, so I really don't understand that. I just want to point it

13  out you know, we'll do our best to try to limit it in some way the best we can I need to do my job

14  but she also needs to have a life too, so I just want to make that

15  TRUSTEE: I understand that and I will offer that Ms. Kaltenbach has been very cooperative

16  so I do appreciate that very much.

17  KRUPP:  [INAUDIBLE] I've got everybody on the committee, the 11 on the committee,

18  I've gotten all the information with the exception of, and I hope I pronounced this right,

19  [INAUDIBLE].  So I've got ten out of eleven. What's the [INAUDIBLE].

20  TRUSTEE:  Ok. Thank you. I thought there is only ten though.

21  [INAUDIBLE]

22  TRUSTEE:  So, ok, so let me know if I need to help with any of that or if you've got what

23  you need and you just need to send it over to Ms. [INAUDIBLE].

24  KRUPP:  I got it.

25  TRUSTEE:  Ok. All right I'm going to continue this to June 25th at 1:00 if that works for

26  everybody.  I'm sorry I don't have any dates before that.

27  KARASIK:  Ms. Kaltenbach does that work for you?

28  KALTENBACH:  Yea. As of this moment I believe it does.

13

**TRANSCRIPTION OF 341(a) MEETING**

1       TRUSTEE:  Ok.  Then, we'll do that and again thank you and I do appreciate this has been

2  a very long examination and appreciate the cooperation. You may all exit for today.

3       MAIL VOICE:  Thank you very much

4       KRUPP:  Thank you. Good job.

5       FEMALE VOICE:  Hello, Is this meeting on June 24th?

6       TRUSTEE:  June 25th at 1:00

7       FEMALE VOICE:  Not the 24th at 11:00

8       TRUSTEE:  That was . . . June 24th at 11:00 was the date set at the court, but actually the

9  court has changed that and is on the website.  So, you can check the website for all of the dates, it

10  will all be on there.

11       FEMALE VOICE:  Great thank you.

12       TRUSTEE:  Thank you.

13       [341(a) Meeting of Creditors concludes at approximately 7:05 p.m.]

14

15  Proceedings recorded by electronic sound recording;
Transcript produced by Buchalter, A Professional Corporation.

16

17  Recorder:                  Office of the United States Trustee
Southern District of California

18

19  Transcription:          Buchalter, a Professional Corporation
1000 Wilshire Blvd., Suite 1500
Los Angeles, CA 90017

20                               (213) 891-0700

21

22

23

24

25

26

27

28

**TRANSCRIPTION OF 341(a) MEETING**

BN 83022340v3

# EXHIBIT 3

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

**A. NAME & PHONE OF CONTACT AT FILER** (optional)
Laura-Jayne Urso

**B. E-MAIL CONTACT AT FILER** (optional)

***PLEASE RETURN TO***
CSC
2710 Gateway Oaks Drive, Suite 150N
Sacramento, CA 95833
Acct. #10011306

20-7800051205
06/30/2020 17:00

FILED
CALIFORNIA
SOS    SECRETARY OF STATE

92026590002  UCC 1 FILING

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

**1. DEBTOR'S NAME:** Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| PIRCH, Inc. | | | | |
| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 3817 Ocean Ranch Boulevard | Oceanside, | CA | 92056 | USA |

**2. DEBTOR'S NAME:** Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

**3. SECURED PARTY'S NAME** (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| CP Fixtures Holdings, LLC | | | | |
| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| c/o Catterton Partners, 599 W. Putnam Avenue | Greenwich | CT | 06839 | USA |

**4. COLLATERAL:** This financing statement covers the following collateral:
All assets of the Debtor

**5.** Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

**6a.** Check only if applicable and check only one box:
☐ Public-Finance Transaction   ☐ Manufactured-Home Transaction   ☐ A Debtor is a Transmitting Utility

**6b.** Check only if applicable and check only one box:
☐ Agricultural Lien   ☐ Non-UCC Filing

**7. ALTERNATIVE DESIGNATION** (if applicable): ☐ Lessee/Lessor   ☐ Consignee/Consignor   ☐ Seller/Buyer   ☐ Bailee/Bailor   ☐ Licensee/Licensor

**8. OPTIONAL FILER REFERENCE DATA:**
PIRCH, INC - SOS- California

340006-001 KPF

Exhibit 3, Page 59

FILING OFFICE COPY    UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)    International Association of Commercial Administrators (IACA)